JUDGE NATHAN

13 CV 5082

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
SUZANNAH B. TROY,

                        Plaintiff,

        -v-

CITY OF NEW YORK; New York City
Commissioner RAYMOND KELLY; New
York City Police Department ("NYPD")
Internal Affairs Bureau ("IAB") Chief
CAMPISI; New York City Police
Department ("NYPD") Deputy Inspector
ED WINSKI; ; NYPD Lieutenant
ANGELO BURGOS; NYPD Sergeant
CHEN; NYPD Detective JOHN
VERGONA;  Det Andy Dwyer ; NYPD
IAB Integrity Unit Sergeant AGNES;
IAB Sergeant Mary O'Donnell In Their
Official and Individual Capacities (Badge
numbers requested  withheld for Det
Vergona, Sgt Chen, Det Dwyer;)

                        Defendants.

**COMPLAINT AND DEMAND FOR
JURY TRIAL**

Index No.

FILED
U.S. DISTRICT COURT
13 JUL 22 PM 1:57
S.D. OF N.Y.

"[T]he First Amendment protects a significant amount of verbal criticism and challenge directed at police officers." *City of Houston v. Hill*, 482 U.S. 451, 461 (1997).

A City Hall spokesman also stated publicly that, "anyone should call the police if they are concerned for the safety of their family." See Jamie Schram, "Khan's Wave of Paranoia: Sics cop on a neighbor" *New York Post*, Apr. 20, 2013, page 21.

"The NYPD stats on crime are like a Las Vegas Casino, the fix is in. "  Suzannah B. Troy regarding the NYPD fixing her being violently assaulted by Dr. Andrew Fagelman's receptionist/office manager Delita Hooks.

Plaintiff SUZANNAH TROY as and for her complaint, does hereby state

and allege:

## PRELIMINARY STATEMENT

This is a civil rights action brought to vindicate plaintiff's rights under the First and Fourteenth Amendments of the Constitution of the United States, through the Civil Rights Act of 1871, *as amended*, codified as 42 U.S.C. § 1983, and pendant claims through the Constitution and laws of the State of New York.

Plaintiff SUZANNAH TROY ("Ms. TROY") also seeks an award of compensatory and punitive damages and attorneys' fees and injunctive relief.

## JURISDICTION AND VENUE

This Court has subject matter jurisdiction over federal claims pursuant to 28 U.S.C. §§ 1331, 1343 (3-4). This action is brought pursuant to 42 U.S.C. §§ 1983 for violations of the First and Fourteenth Amendments to the Constitution of the United States.

Pursuant to New York State General Municipal Law § 50-E, Ms. TROY filed a timely Notice of Claim with the New York City Comptroller on or about January 7, 2013. Thus, this Court has supplemental jurisdiction over Ms. TROY claims against defendants under the Constitution and laws of the State of New York because they are so related to the within federal claims that they form part of the same case or controversy pursuant to 28 U.S.C. § 1367(a). Ms. TROY's claim was not adjusted by the New York City Comptroller's Office within the period of time provided by statute.

Venue is proper pursuant to 28 U.S.C. § 1391(a)(2) in that Ms. TROY's claim arose in the Southern District of New York.

## PARTIES

Ms. TROY is, and was at all times relevant to this action, a resident of the County of Kings in the State of New York.

Defendant CITY OF NEW YORK ("CITY") is a municipal entity created and authorized under the laws of the State of New York. It is authorized by law to maintain a police department which acts as its agent in the area of law enforcement and for which it is ultimately responsible. Defendant CITY assumes the risks incidental to the maintenance of a police force and the employment of police officers as said risks attach to the public consumers of the services provided by the NYPD.

Defendants New York City Commissioner RAYMOND KELLY, NYPD Internal Affairs Bureau ("IAB") Chief Campisi ("CAMPISI"), NYPD Deputy Inspector Ed WINSKI ("WINSKI"),  NYPD Lieutenant Angelo Burgos ("BURGOS"), NYPD Sergeant CHEN ("CHEN"), NYPD Detective John VERGONA ("VERGONA"), Detective Andy DWYER (DWYER), and NYPD IAB Integrity Lt. AGNES ("AGNES"),  Sergeant. Mary O'DONNELL (O'DONNELL) (referred to collectively as the "officer defendants") are and were at all times relevant herein, officers, employees and agents of the NYPD.

The individual defendants are being sued in their individual capacities, and defendants KELLY, CAMPISI, WINSKI, BURGOS, CHEN, VERGONA, DWYER, AGNES and

O'DONNELL are being sued in their individual and official capacities.

At all times relevant herein, the officer defendants were acting under color of state law in the course and scope of their duties and functions as agents, servants, employees and officers of the NYPD, and otherwise performed and engaged in conduct incidental to the performance of their lawful functions in the course of their duties.  They were acting for and on behalf of the NYPD at all times relevant herein, with the power and authority vested in them as officers, agents and employees of the NYPD and incidental to the lawful pursuit of their duties as officers, employees and agents of the NYPD.

The officer defendants' acts hereafter complained of were carried out intentionally, recklessly, with malice, and in gross disregard of Ms. TROY's rights.

At all relevant times, the officer defendants were engaged in a joint venture, assisting each other in performing the various actions described herein and lending their physical presence and support and the authority of their offices to one another.

## STATEMENT OF FACTS

By way of background, Ms. TROY is an activist and has accomplished many successes for her community. In August of 2009, Ms. TROY won a campaign to improve the safety of the streets for Anna Silver School and the adjoining school, and a speed bump was put in, as well as more signage and the timing of the lights changed to keep the children safe from speeding cars. Ms. TROY also won a campaign to have bathroom doors (although smaller) returned to the Tompkins

Square Park Women's room and had the pleasure of witnessing a woman in a wheelchair with the assistance of her friend use the handicap toilet and close the door.    Ms. Troy worked with the NYPD and Parks Dept. to return the doors suggesting "smart doors" (smaller) to discourage activity that incurred the doors removal. Ms. TROY succeeded in getting Henry Buhl, named in the Vesco Scandal of many years ago, to remove his illegal planters he dropped on Prince Street to displace Artist and Veteran Vendors who had been there for years. Ms. TROY also worked with the community to Save Whole Earth Bakery & Kitchen and succeeded in preventing Peter Silvestri from eviction by his landlord. Filomena Silvestri died at age 94 knowing her son and her business were not evicted.  Ms. TROY has played an active and positive role in her community for many years.    Most recently Ms. Troy testified at City Hall June, 21, 2013 regarding the 911 Tech system calling for a criminal investigation as she has done consistently from her blog and YouTubes for over 1 year.  She also called for an investigation in to the ambulance response time for Mark Carson's ambulance. Prior to this she worked with Local 375 DC 37 on CityTime corruption.  May 27, 2010 after meeting with union members she made a YouTube "Mayor Mike Bloomberg's CityTime tax payers Titanic renewal must be stopped September". Several months after Ms. Troy's YouTube SAIC was banned from any more contracts  with the State and City of New York by the NY State Comptroller.  July

14, 2011 Ms. Troy joined Local 375, DC 37 , other Unions and City Council Members to speak outside SAIC's NYC offices to demand money back for the People of New York.   The YouTube "Mayor Bloomberg Suzannah B. Troy's Speech Outside SAIC RICO " documents Ms. Troy's speech where she asked for 1billion dollars x 3 RICO for the People of New York City regarding CityTime crime and SAIC's role.  SAIC did return $450 million dollars cash.

Ms. Troy has had approximately 15 letters published in various newspapers after Sept. 11 on behalf of the NYPD.    "Betrayal at Ground Zero" April 27, 2005 and Ms Troy has stated many times on her blog the betrayal has grown exponentially.

The New York Times, April 21, 2004, "Police and Fire Raises", Ms. Troy asks for a sizable raise for the NYPD and FDNY.

In AM NY November 13, 2006 "NYPD, FDNY Deserve Better" Ms. Troy states "I do no support raises for those that govern until the NYPD starting salary is raised and our firehouses reopen." AM NY "Barron needs to show restraint",  Ms. Troy writes:  I am sorry for anyone who's life is cut short…..Mr. Barron, please volunteer for one week, or regularly for nightly citizen patrols on the rooftops and

streets in areas where crime is the highest before rushing to judgement and dismissing an entire police department and Police Commissioner Ray Kelly. To be an officer in this city requires courage especially in high crime areas."

After 9-11, Ms. Troy despite just having a second surgery to her right knee went down to her health club, the NYHRC, on Whitehall Street to massage Military and NYPD for free in the lobby of her health club. She said to some uniformed NYPD, I don't want you to get in trouble so just take off your shoes and I will massage your feet so you can get back to work. She recognized they had to work long hours standing on their feet to make New Yorkers feel safe to return downtown.

Her jacket with patches from Rescue Workers and other volunteers will be on display at the September 11 Museum. The jacket has numerous NYPD patches from many different divisions including NYPD Detectives. Ms Troy wrote a short fictional story honoring the NYPD detectives that volunteered for the Morgue after 9-11 calling them "pinch-hitting angels". Ms Troy also was a volunteer at Rusk NYU Medical Center with pre-school handicap children but after the September 11 Terrorist Attacks she volunteered to help NYU Medical

archive volunteerism 9-11. Ms. Troy called every person who attempted to volunteer with NYU Medical Center 9-11 and thanked them as well as archived for the hospital the smaller group of People that actually did get to volunteer. One woman told Ms. Troy it was an honor to bring an NYPD Detective a cup of coffee at the Morgue they had set up after 9-11.

Ms. Troy also wrote a report on how the NYPD could improve community relations for Deputy Inspector Dennis DeQuattro than Commander of the 9th Precinct where she lived for 20 years and mailed a copy to Commissioner Ray Kelly following up via emails to Commissioner Kelly suggesting the NYPD create their own YouTube channel, get on twitter and facebook. The NYPD did eventually set up a YouTube channel as Ms. Troy and others suggested. Ms. Troy credits Jack Maple and his book "The Crime Fighter" for inspiring the suggestion since Jack Maple originally suggested NYPD TV. Ms. Troy emailed Commissioner Ray Kelly suggesting YouTube would be a cost free way to have NYPD TV.

It should also be noted Ms. Troy's first letter published was in The Financial Times June 3/4 2000 comparing her art to Lucien Freud's portrait of an older woman full frontal stating women are lagging behind men with regard to the most

basic human rights and economic power.

Ms. Troy considers herself a cross between Mike Wallace and Mae West.   She fights for women's rights, safety as well as celebrates women's sexuality and empowerment.

Ms. Troy filed a grievance against Chad Seigel of Tacopina Seigel with the Supreme Court Committee objecting to Seigel's comparison of a rape victim's and all women's genital snapping shut like a Fly Trap during the rape trial of  NYPD PO Moreno aka  the NYPD Rape Cop.   Besides Chad Seigel's comment being misogynist it was also in Ms. Troy's opinion a hate crime in court encouraging even more violence towards women.

Ms. Troy next had a letter in The New York Times, June 22, 2001, "The Battle over the Murals of Pain".

Ms. Troy flew to Israel immediately after the letter was published  to visit Yad Vashem to show her support of the Holocaust Museum's rescue of  Bruno Schulz's art.   It should be noted that Ms. Troy asked the NYPD to investigate her allegations of anti-Semitism by Det John Vergona involved her being violently

assaulted and Det Vergona's threatening her with arrest using a false cross complaint and demanding Ms. Troy wait 4 days until the Sabbath.  Det John Vergona refused to answer Ms. Troy's questions starting with asking why she had to wait 4 days for a false arrest.  Det Vergona refused to answer any of her questions including "Det. Vergona,, arrest the Jew on the Sabbath, are you anti-Semitic?"  While Ms. Troy was in Jerusalem, her father Prof. Troy was in Poland to visit the location where his Uncle was taken from and murdered by the Nazis. His Polish guide refused to take Prof. Troy to the address on the postcard stating he could not find the address as well as offering to sell Prof. Troy a piece of a Torah which his sacrilegious and anti-Semitic.

To the Editor:

Re "Artwork by Holocaust Victim Is Focus of Dispute" (front page, June 20):

As a Jew and an artist, I would prefer that my art rest in the loving embrace of Yad Vashem, where millions of people of all backgrounds can see it, rather than in a dwelling that was the nursery of a Gestapo officer's child.

The wall minus Bruno Schulz's art should be displayed as a monument in Poland as a reminder of what was not done to save the Jews.

SUZANNAH B. TROY  New York, June 20, 2001

Ms. Troy has donated her white blood cells to help a child fighting Non-Hodgkins Cancer and a 28 year old Hispanic male

in Newark Hospital with Lymphoma.

Several years ago, Ms. Troy donated her blood at The First Precinct and while doing so an NYPD officer entered the NY Blood Camper, stared at Ms. Troy's breasts and said, that reminds me,  I have to call a stripper for the party.

### October 1, 2012 Attack at Medical Offices Soho

On October 1, 2012 at approximately 3:30 p.m., Ms. TROY went to a doctor's appointment at her doctor's, Dr. Kathleen Vine ("Dr. Vine"), office, at 155 Spring Street in Manhattan.

Upon information and belief, Dr. Vine shared this office with other medical doctors, including a Dr. Andrew Fagelman ("Dr. Fagelman"), who all shared a single reception.

At approximately 4:10 p.m., Ms. TROY exited her appointment, was very thirsty from the stress of the medical procedure which was painful and required two injections to numb her elbow to remove a cyst so she stopped near the exit by Ms. Hooks reception area which has no name plates and get some water.  Ms. Troy noticed a water cooler in the reception area and accompanying styrofoam cups.

Ms. TROY turned to the receptionist, Delita Hooks ("Ms. Hooks"), who, upon information and belief, is employed by Dr. Fagelman, and asked Ms. Hooks, in sum and substance, "Would you consider using paper cups instead of Styrofoam? It's better for the environment."

Ms. Hooks reacted angrily, striking the desk, yelling at Ms. TROY, and coming

out from behind the reception desk at Ms. TROY in a threatening manner.

At this point, Ms. TROY attempted to retreat, while Ms. Hooks continued to physically threaten her and ultimately repeatedly physically attack Ms. Troy despite co-workers yelling "No, Dee, don't do it!" as recorded on video.

Ms. TROY used her cell phone to film the beginning of the physical attack that ensued after a verbal assault beginning with Ms. Hooks berating Ms. Troy standing up and yelling that Ms Troy has no rights and coming out from behind a long closed off counter to menace Ms.Troy, Ms. Hooks provoked Ms. Troy to go back down the hallway to find Dr. Vine for help. Dr. Vine's medical assistant alerted Ms. Troy that Dr Vine was already in with another patient so Ms. Troy attempted to exit but Delita Hooks got in front of the exit to violently give Ms. Troy the finger.. Ms Troy was stunned and shocked by such unprofessional behavior. Ms Hooks had violated her patient rights. Ms. Hooks provoked Ms. Troy to turn around and politely ask Ms. Hooks, would you please give me the finger again, now I am filming. Ms. Hooks could have easily closed the door to prevent any more interaction but became even more violent and threatening. Ms. Hooks, inter alia, stated caught on video "I will slap the crap out of you!". Delita Hooks said get out but Ms. Troy had already retreated out the door and again Ms. Hooks could have closed the door if she did not want to be filmed but did not. Ms. Hooks said don't take no frigging pictures of me and instead of closing the

door to prevent any filming, Delita Hooks uses the door to begin the physical part of her assault slapping Ms. Troy 's hand and iPhone  knocking the phone to the ground twice but the phone was still filming.  Delita Hooks took off her shoes throwing one at Ms. TROY and than running as fast as she could, punched Ms. TROY in the left eye as Ms. Troy held 2 bags on her left shoulder, her left arm numb from 2 injections in her arm to remove a cyst and in her right hand Ms. Troy held her phone.   Ms. Troy was not interested in fighting Ms. Hooks and never put down her bags or phone throughout the violent attack on Ms. Troy. After a running punch to Ms. Troy's eye,   Delita Hooks than grabbed Ms. Troy's hair, her goal to drag Ms. Troy down the hall to the elevator.

Ms. TROY responded only defensively throughout the incident.  After a painful running punch to Ms. Troy's eye, Ms Troy used her left hand in a limited fashion to make a short jab to Ms. Hooks face but she did so with her numb left arm and two bags, one quite heavy and Ms. Hooks was right on top of her so her punch was ineffectual and lacked the momentum of Delita Hooks running punch and Ms. Hooks target Ms. Troy's eye.  In the most minimal way to get Ms. Hooks off Ms. Troy's body, Ms. Troy defended.  First Ms. Hooks threatened Ms. Troy with bodily harm, began hittng her with an open hand slapping Ms. Troy's hand and her phone to the floor twice rather than closing the door, a running punch, grabbing Ms. Troy's hair and earring ripped out.   Ms Troy used Ms. Hooks

momentum to take her to the ground as gently as possible and let go immediately. Ms. Hooks  friend and co-worker yelled at Ms. Troy to let go of Ms. Hooks.   Ms. Troy was bent over like a bridge as Delita Hooks was pulling on her hair further damaging her neck. Ms Troy despite being bent over as Ms. Hooks continued to yank Ms. Troy's hair,  Ms. Troy held up her hands and said I am not touching her. She won't let go of me pointing to Delita Hooks yanking Ms. Troy's hair from the ground.  Delita Hooks accidentally kicked her co-worker and friend who than said "Oww!" as Delita Hooks kicked her by accident.

Ms. Hooks  repeatedly tried kicking Ms. Troy finally pressing one of her barefeet up against Ms. Troy's vaginal area despite Ms. Troy's efforts from the start of Delita Hooks violent attack to keep her body away from Ms. Hooks.

Ms. Hooks continued yanking Ms. Troy's hair further hurting Ms. Troy's neck refusing her own co-workers demand she let go of Ms. Troy as she finally succeeded to but her barefoot against Ms. Troy's crotch.

While Delita Hooks co-workers/friends finally escorted Ms. Hooks back in to the office, Dr Vine's medical assistant broke in to the examining where a patient was undressed to get Dr. Vine who immediately came to Ms. Troy's assistance by the elevator.  After leaving Ms. Troy,  Dr. Vine confronted Dr. Fagelman to demand

Delita Hooks be fired.  Dr. Fagelman refused.  Delita Hooks returned to her desk.

Upon exiting the office, Ms. TROY called the NYPD Office of the 1st Precinct ("1st Precinct"). When no one answered, she walked to the 1st Precinct and made a complaint.

It should be noted 5 seconds in to the video a woman, a co-worker and friend of Ms. Hooks, in medical uniform is leaning against the wall watching with her hands behind her back.  When Delita Hooks threatens Ms. Troy with bodily harm the woman runs toward Delita Hooks who begins assaulting Ms Troy.   Also it should be noted Dr. Vine and her partner vacated the offices of 155 Spring Street two weeks after Delita Hooks violent assault of Suzannah Troy, Dr. Vine's patient. Delita Hooks was not fired and remains at the front desk of Dr. Fagelman's offices which he continues to share with other doctors.  Ms. Troy is still being treated for damage to her eye and neck.  Ms Hooks also damaged Ms. Troy's iPhone case, an earring ripped from her ear is gone but her ear lobe is okay and Ms. Troy was able to repair a sign she wore like a large necklace protesting a need for a Trauma Level 1 Hospital in the West Village where St. Vincent's Hospital which Ms. Hooks damaged along with long scratches defensive wounds on Ms. Troy 's arms injuries and damage Det John Vergona refused to investigate in person never

meeting Ms Troy or going to 155 Spring St as he repeatedly said he would via the phone and also email.

### Refusal to Investigate and Discriminatory Treatment

On October 2, 2012, Ms. TROY received an MRI the day after Delita Hooks violently attacked her grabbing her hair and repeatedly wrenching and pulling Ms. Troy 's neck.   The MRI showed a serious arthritic condition and bulging and herniated disks.    Ms. Hooks ripping and pulling Ms. Troy's neck over and over refusing to let go as instructed by her co-worker greatly harmed Ms. Troy's neck and she was instructed to start wearing a neck brace and immediately get an epidural injection in her neck for the pain post the violent assault by Ms. Hooks. There are only 7 cervical vertebrae in the neck and more than half of Ms. Troy's neck is in serious condition and Ms. Troy lives in constant pain from the arthritis and injuries to her neck from Ms. Hooks.


Injuries Det John VERGONA refused to take seriously because of his biases against Ms. Troy.  He said you should have kept walking blaming her in a similar way that rape victims are blamed for being raped.


 Ms. Troy saw a surgeon for possible fusion of the vertebrae but elected to forgo surgery because of the lack of assurance of long lasting results to cure the pain

and regain movement in her cervical spine.

From Ms. Hooks yanking back Ms. Troy's neck after punching her in the eye grabbing her by the hair  Ms. Hooks violence caused Ms. Troy to develop floaters in both her eyes.

Ms. Troy had to endure eye surgery to repair the hole in Ms. Troy's retina made by Dr. Fagelman's receptionist office manager Delita Hooks from a running punch as Ms. Troy backed away and may need a second surgery to remove scar tissue called an emacular pucker.  Which out surgery Ms. Troy would have lost vision in her eye yet the NYPD and IAB have yet to treat Ms. Troy as a victim in this violent crime and to date have not meet to interview Ms. Troy in person to discuss the assault and the violent injuries and the NYPD role in fixing this violent crime. Ms. Troy faxed The First Precinct and IAB updated information on her medical reports.   Since Detective Vergona never went to the medical office to interview everybody as he said he would both over the telephone and via email, Ms. Troy faxed the IAB, who has yet to contact in response, a photo from Dr. Fagelman's website of the long closed off reception desk of which Ms. Hooks sits at the very front by the door's entrance/exit.  Ms. Hooks had to come quite aways to come out

from behind a long closed off desk to get to Ms Troy  to stalk her to the door rather than let her exit peacefully after a painful medical visit that cost $430 violating  her patient rights.  Ms. Troy wanted IAB to see the long closed off desk also because Det. Andy Dwyer never even contacted her to interview her.  Ms. Troy also reported to IAB her concerns when she agreed to be false arrested Oct 16 and than to the delayed arrest to Saturday Oct. 20th, 2012 that Ms. Hooks was never contacted by either set of detectives that fixed this violent crime for her the aggressor, Delita Hooks,  to turn her self in.  Ms. Troy has yet to hear back from Internal Affairs who refused to give her this information and badge numbers of officers involved as did CCRB.

October 4, 2012, Ms. TROY received a call from defendant VERGONA, wherein she informed him that Ms. Hooks attacked her. In follow up to the conversation, Ms. TROY provided defendant VERGONA:

> 1.) Video of the October 1, 2012 attack; YouTube was posted Oct. 4 after a slanderous harassing comment posted on a YouTube of Ms. Troy's on ECTP 911 Tech Corruption with Ms. Troy sporting a black eye so Ms. Troy posted the "assault video" which also proves NYPD fixing as well as Delita Hooks threatening Ms. Troy with bodily harm and than

aggressively attacking rather than closing the door.

The video currently has 14,077 views and after 12,500 views was given an adult rating for violence.

2.) The medical report from Ms. Troy's primary care physician reflecting, not yet included where 2 additional medical reports from 2 eye specialists for a detached retina Oct 19 the day before Ms Troy's scheduled arrest (Det Vergona stated he did not care if Ms. Troy had 2 black eyes) but Det Vergona did receive a fax from Ms. Troy's spine specialist regarding damage to cervical spine; and

3.) Three (3) photographs of her injuries, showing her black eye and defensive wounds on her left forearm.


4) Ms. Troy faxed IAB updates that without surgery Ms. Troy would have gone blind in her left eye from Delita Hooks running punch and post - surgery Ms. Troy now has scar tissue called an emacular pucker.

This video shows indisputably that Ms. Hooks attacked Ms. TROY and shows Ms. TROY attempting to back away.   Delita Hooks could have easily closed the door after provoking Ms. Troy to film her inappropriate, and unprofessional violent hand gesture.  Ms. Hooks got between Ms. Troy and the exit to do so and Ms. Troy wanted to document the unprofessional behavior after first seeking help

from Dr. Vine who had unfortunately already returned back in to the examining room with another patient as her medical assistant alerted Ms. Troy who was distressed at her patient rights being violated.   Ms. Troy was first provoked to seek assistance from her MD, Dr. Vine after Ms. Hooks stood up berating stating who are you to say anything and yelling, you have no rights at Ms. Troy.   Ms Hooks started to move to come out from behind the long closed off reception desk and yelled You leave trash in the waiting room! Ms. Troy responded that is  not true.  She said that is libel but meant to say that is slander.  When Ms. Troy  could not get Dr. Vine's help and Ms. Hooks blocked her exit to give her the finger Ms. Troy was provoked to document this behavior to show her MD.   Delita Hooks behavior that Ms. Troy caught on video is shocking and disturbing as well as violent and unprofessional but without the video words could not convey what the video camera documents and Ms. Troy was lead to believe that Delita Hooks lied about Ms. Troy blaming her as well as the false cross complaint Ms Hooks made with the NYPD which the video proves as Ms. Hooks is clearly the aggressor and Ms. Troy is seen backing away.   Ms. Hooks could have closed the door and instead took a verbal assault of a medical patient to a physical assault.

There is no justification for medical staff to berate let alone slap, punch, pull a patients hair and repeatedly kick a patient.

Ms. TROY informed defendant VERGONA of her statement just prior to her attack on October 1, 2012 wherein she stated in the doctors' office, in sum and substance jokingly , "Thank you, I'll see you next summer, and if I can afford injections then I'll get them to attract younger men."

Upon information and belief, defendant VERGONA reacted to this statement by developing a misogynistic attitude towards Ms. TROY.

On October 4, 2012, Ms. TROY spoke with defendant VERGONA, who stated he would conduct an investigation at the office on the following Monday, October 8, 2012.

Upon information and belief, despite repeated promises, defendant VERGONA failed to conduct a single interview of a witness related to the October 1, 2012 attack.   Ms. Hooks detective, Det. Andy DWYER never contacted Ms. Troy to hear her side of the story.   Only Ms. Troy's attacker met with the NYPD.   Det Andy DWYER , Ms. Hooks' detective and partner never contacted Ms. Troy so Ms. Troy had no idea Ms. Hooks had filed a false cross complaint the next day.


On or about October 4, 2012, Ms. TROY contacted defendant VERGONA to provide additional information regarding the case, at which time defendant VERGONA said to her, in sum and substance, "I DON'T CARE IF YOU HAVE

TWO BLACK EYES. STOP BABBLING." Det Vergona repeatedly refused Ms.

Troy's requests to meet with him Oct 4th to see the wounds to her eye, her neck

and defensive wounds to her arm.   Det. John VERGONA refused to meet with

Ms. Troy.  The NYPD only met with Ms. Troy's attacker Delita Hooks.  Delita

Hooks had told Ms .Troy she had no rights and her NYPD detectives clearly

agreed refusing to contact Ms. Troy who had no idea Ms. Hooks even filed a false

cross complaint until Oct. 16, 2012.   Ms. Troy had called Dr. Vine's receptionist

from the First Precinct asking the name of the violent woman who attacked her

and Dr. Vine's receptionist who sits next to Delita Hooks said she did not know

her first and last name but only that Delita Hooks is called "Delite".


Apparently everyone in the video and the NYPD were to learn Ms. Troy's name

but all their names with the exception of Det. Vergona were with held from her.

Ms. Troy alleges Delita Hooks violated her patient privacy because her letter to

the NYPD states Ms. Troy's full name.   Ms. Troy alleges upon information and

belief,  medical reports submitted by Delita Hooks are forged since Ms. Troy had

minimal contact with Delita Hooks while defending her repeatedly violent assault.


Ms. TROY, who is a regular blogger and internet activist, also posted the video of

the attack and photographs on the website youtube.com.

These posts received a number of threatening comments, the contents of which Ms. TROY relayed to defendant VERGONA , a most egregious one on Sunday night, October 7, 2012.  The comment called Ms. Troy a confrontative cunt and threatened Ms. Troy but Det VERGONA never discussed this email with her or her concerns of witness tampering and aggravated harassment.  It should be noted that the comments continued up until July after a series of reports to Internal Affairs and complaints against Internal Affairs because Ms. Troy alleges if IAB had contacted the First Precinct to arrest Ms. Hooks for assault and a false cross complaint  she and her friends and patients associated with her and Dr. Fagelman would not continue to blame Ms. Troy when Ms. Hooks violated Ms. Troy 's patient rights to a safe environment, patient privacy and threatened Ms. Troy with bodily harm and than repeatedly assaulted and battered Ms. Troy who finally defended herself after the third assault to her body without ever putting down her bags, one holding an iPad that was heavy and both bags where on her left shoulder; her left arm was numb from 2 injections to remove a cyst on her elbow, a $430 medical procedure and in her right hand, her dominant hand Ms. Troy held her Iphone which she never let go of doing the minimal to defend her self and continue to make as much distance between her and Delita Hooks as first seen in the video footage Ms. Troy captured which went black when Delita Hooks running punch hit Ms. Troy fully in the eye; the camera  shut off . Ms .Troy had

no interest in fighting Ms. Hooks and has photos of her pre-the attack posted on her blog being happy and had even done a yoga class early in the day with Peace prayers.  Ms. Troy has aged dramatically and  if Ms. Hooks wanted to rob Ms. Troy of feeling good, happy and safe in a medical setting she succeeded.

Ms. Troy could no go to the First Precinct to report the alleged aggravated harassment concerns but did report them to IAB.   A detective said IAB would look in to the concerns of alleged aggravated harassment and alleged witness tampering by Ms. Troy.  The next and last comment Ms. Troy was told by an IAB Sgt that they would not look in to after all because it was not an NYPD officer making the comments.  Because of extreme bias and prejudice against Ms. Troy including by supervisors at the 01 Precinct named in this law suit  Ms. Troy could not show by the First Precinct Detective Squad  and seek their help.   Ms. Troy did not report her concerns of harassment via YouTube comments from November to July 2013 to the Detective Squad.

On or about October 9, 2012, Ms. TROY sent to defendant KELLY a package via FedEx informing him of  her concern's the NYPD's particularly Det John Vergona's failure to investigate her case. The FedEx to Commissioner KELLY focus on  "Project Peace to the Street, Project Hope" a concept based on home

made short films that celebrate community, people, love  and festivals with tables
of every kind of support and offering to help the People of communities that are
over whelmed with violence hope.      The goal would be to replace these regular
festivals in ten years time dues to economic growth and healing communities with
Film Festivals in Brooklyn, Harlem, Staten Island and the Bronx rivaling Tribeca
Film Festival .

Commissioner Kelly never responded to this project or Ms. Troy's query
wondering when Det. VERGONA was going to contact her and also arrest Delita
Hooks.    Ms. Troy later wrote Commissioner KELLY,   Chief CAMPISI, DI and
Edward WINSKI requesting the badge numbers of Sgt Chen and Det Vergona
including a print out of an email she sent Lt. Angelo BURGOS who also never
responded.    CCRB and Internal Affairs also refused to give badge numbers or
even Det Andy Dwyer's name so when she filed a complaint against Det Andy
DWYER with Internal Affairs Ms. Troy had to file it as "John Doe and partner"
Ms. Troy also asked NYC Gov Commission to Combat Police Corruption
repeatedly for help and found like IAB and CCRB it was an exercise in futility.

Ms Troy also called the Det Squad, the front desk of the First Precinct, CCRB and
IAB one more time asking for badge numbers of officers she was suing as the

Comptrollers Investigator asked for them and they all stone walled her.


To date Internal Affairs has yet to contact Ms. Troy to interview her regarding Det
John Vergona and Det Andy Dwyer refusing to meet with Ms. Troy to investigate
Ms Troy' being the victim of a  violent assault but Ms. Hooks who berated Ms.
Troy after a $430 medical procedure telling Ms. Troy telling her  she has no rights
and than violently assaulted Ms. Troy after threatening with bodily harm did get a
meeting with the NYPD unlike her victim Ms. Troy.    NYPD Det Andy Dwyer
never contacted Ms. Troy who was not even aware of his name in time to include
his name in the Notice of Claim.   She never met with any detective or supervisor
all refusing to meet with her thereby showing extreme bias and prejudice except
Det Andy Dwyer who never made his existence known to Ms. Troy and Det John
Vergona with held his name and prevented Ms. Troy from contacting him
although Det Andy Dwyer should have in good faith contacted her.  Everyone one
of these NYPD officers and IAB officers made an oath when they joined the
police forced.  Ms. Troy alleges they did not keep that oath when it came to her
being a victim of a violent assault at Dr. Andrew Fagelman's office.


Ms. Troy did meet with IAB Sgt O'Donnell but not on the matter of Det John
Vergona or Det Dwyer's actions but regarding Ms. Troy's concerns regarding  Dr

Fagelman who told Ms. Troy's private investigator sent in via a lawyer when asked Dr. Fagelman did you speak to the police, Dr. Fagelman responded "No comment." Det Vergona had told me Ms. Troy that no detectives would interview the doctors involved because they did not directly witness the assault.  Ms. Troy made up the term 1-800-NYPD PBA IAB fix it inspired by the trial of Police Officer Ramos in the Bronx since fixing and favors only go on in the Bronx yet based on Dr Fagelman's response when asked if he spoke to the  police Ms. Troy asked IAB to investigate if their indeed was some kind of relationship.   After meeting with IAB Sgt Kroll and Sgt O'Donnell Ms. Troy felt the case was closed. Ms. Troy told them about the Adrian Schoolcraft trial and Chief Marino who was caught along with 24 other NYPD officers "juicing" aka taking human growth hormone supplied by Dr. Richard Lucente of Staten Island.   Ms. Troy had no evidence but just concerns considering the extreme bias the NYPD showed her and the deference shown in contrast to Delita Hooks the clear aggressor who attacked Ms. Troy as she held her bags her arm numb from a medical procedure as well as the other medical staff at 155 Spring Street they spoke to but again all NYPD detectives involved never met Ms. Troy and Det John Vergona flat out refused several times as Ms. Troy asked even pleaded that he see her wounds most especially her eye.  Ms. Troy expressed concerns and a belief of fixing and a possible favor for Delita Hooks and her employer if in fact Dr Fagelman did

speak to the police although he refused to answer yes or no.

The Commission to Combat Police Corruption forwarded an email from Ms. Troy to Sgt. O'Donnell.   Ms Troy posted the  audio recording now on YouTube with IAB Sgt stating "case closed"  regarding the assault despite Ms Troy stating the video is proof and why would why she drop the charges?     IAB Sgt O'Donnell was not interested in investigating why Ms Troy would drop the charges with a video that later a higher ranking IAB officer John Doe would state the video speaks for itself.  Sgt O'Connell states she is only calling about Sgt. Chen.  Ms. Troy asked Sgt O'Donnell to never contact her again doubting her willingness to really investigate why Ms. Troy would have dropped the charges despite overwhelming and indisputable evidence that Ms. Troy was violently assaulted. Ms. Troy asked Sgt O'Donnell if  she had gotten the fax of an email from her lawyer to Ms. Troy proving the letter faxed to the NYPD was not what Ms Troy agreed to  and she said no and she did not want it.

Ms. Troy did speak with IAB Lt. John Doe regarding her concerns that Sgt O'Donnell was not really going to investigate anything involving Ms. Troy's allegations and unlike Sgt O'Donnell the Lt. stated that he did watch the video of Ms. Troy being assaulted and he stated this: The video speaks for itself.

Despite his assessment to date there is still no arrest of Delita Hooks for assault and a false cross complaint as the video clearly proves and no NYPD officer and IAB officers have been held accountable regarding complaints Ms. Troy has made against them.   To date IAB has yet to interview Ms. Troy on Det Vergona's verbally violent threats and coercion with the goal to make Ms. Troy drop the assault charges and also why Det Andy Dwyer never contacted her..

Ms. TROY made complaints regarding the officers who refused to investigate her complaints to defendants Sergeant CHEN, DI Edward WINSKI, Lt. AGNES, Lt. BURGOS, Sgt. O'Donnell.

On or about October 11, 2012, Ms. TROY called  the 1st Precinct hoping to have charges brought against Ms. Hooks for her attack, and speaks with Detective  Del Pozo.

On or about October 13, 2012, defendant VERGONA informed Ms. TROY via email he would investigate the following Monday finally going over to the medical office (which in fact he never did) , October 15, 2012 and requesting that she call him on that afternoon. On the afternoon of October 15, 2012, Ms. TROY called and left a message with defendant VERGONA, who did not return the call. Ms. Troy wondered why he didn't call her after he returned from the office after interviewing her attacker but instead had her call him and than refused to take her

call after instructing her to call.  It was like Det Vergona and her partner keeping

her own hold in a Fraternity type style prank asking are you still there again never

treating Ms. Troy as the victim of a violent crime in a medical office with serious

injuries.


A medical office is suppose to be a safe place.


An NYPD Precinct is suppose to be a place to go to seek help especially when

one is a victim of crime but Det Vergona suggested the First Precinct would

become a place for Ms. Troy to be falsely imprisoned or coerced in to dropping

charges despite serious and dangerous injuries especially her eye and neck.


IAB history of Blind-Eye-Itis connected to Det John VERGONA's lack of

responsiveness and bias towards Ms. Troy?


IAB has a history of being either non-responsive or ineffectual regarding Ms.

Troy contacting IAB regarding NYPD officers walking past a fake NYPD parking

placard parked in front of The Mercer Hotel to go ticket an 81 year old Korean

War Veteran Vendor over inches.

Ms. Troy contacted IAB over NYPD PO Schatz from the First Precinct aggressively pulling up to Ms. Troy in a squad car while Ms. Troy was leaving a voice mail for Internal Affairs barking at her "They can park there."  NYPD PO Schatz was referring to guests of The Mercer Hotel who's cars are parked illegally.  The Mercer Hotel runs the "loading and unloading zone" as private parking with valet service and NYPD PO Schatz was incorrect  regarding his statement.  The guests cannot park in the loading and unloading.

November 20, 2010 Ms. Troy had alerted and invited Commissioner Ray Kelly, a Viet Nam Veteran and DI Ed Winski to her 15 minute Peaceful Protest against The Mercer Hotel harassing Veteran and Artist Vendors.  No NYPD attended up until 2 minutes before the short protest ended because vendors have to work and can't afford a longer protest.  NYPD PO Schatz illegally used his sirens as caught on video posted on YouTube to intimidate and interfere with the protest which ended exactly on time leaving NYPD PO Schatz to circle back and verbal abuse the most elderly Veteran, an 81 year old Korean War Vet who leaned on NYPD PO Schatz car for balance because his legs don't work properly.

Rather than IAB taking any action regarding The Mercer Hotel and the First

Precinct's special relationships and any concerns of Ms. Troy's regarding NYPD

PO Schatz;  Schatz was promoted to Community Affairs at the First Precinct.

Ms. Troy has reported to IAB the First Precinct favors the richest people that live

in the First Precinct besides The Mercer Hotel, Henry Buhl and now Ms. Troy

expressed concerns about the NYPD and Dr. Fagelman who lives and works by

the First Precinct, IAB's offices and One Police Plaza.


Ms. Troy was threatened with unlawful arrest as the video, photos and medical

reports prove in retaliation for complaints Ms. Troy made against the Police

department specially The First Precinct.       Ms. Troy also alleges the same

detective squad did creative policing under the First Precinct's than Commander

DI Bologna to arrest a whistle blower "Jane Doe" on  ECTP 911 Tech corruption

purposefully misplacing her 2 of her 3 complaints filed first and instead using

retired NYPD John Doe's cross complaint to intimidate and silence Jane Doe.

Retired NYPD John Doe was a consultant on the 911 Tech system that Ms. Troy

is calling for a criminal investigation in to.


Ms. Troy contacted the Hate Crime Units at One Police Plaza regarding her

allegations of Det VERGONA delaying her unlawful arrest until Saturday, Oct.

20, 2012 and refusing to explain why she had to wait 4 days until the Sabbath.

Arrest the Jews on the Sabbath? Are you anti-Semitic?  Det John Vergona refused

to answer Ms. Troy's questions.    Det Sanchez of the Hate Crimes Units referred

her to any precinct to make file a complaint against Det John Vergona that would

be forwarded to The Hate Crimes Unit for Investigation.    Ms. Troy walked in to

the 9th Precinct, the neighborhood precinct where she had lived 20 years and

attempted to file a complaint and was turned away.  The NYPD officer at the front

desk said leave it to Internal Affairs to investigate.    Internal Affairs has never

contacted Ms.Troy regarding her allegations of Det Vergona's biases against her

including anti-Semitism as well as misogyny.

It should be noted Oct. 16, 2012 after Ms. Troy agreed to be false arrested she

stopped a good and honest NYPD officer in the subway and showed him the

video of Dr Andrew Fagelman's receptionist assaulting Ms. Troy and alerted him

she as going to be false arrested.   The NYPD officer said first the receptionist

(DELITA HOOKS) threatens you with bodily harm, her key also becomes a

weapon as she assaults you and than she committed another crime and walks in to

a precinct to file a false cross complaint against you.

To date Internal Affairs has not interviewed Ms. Troy about the assault and

answer questions including was Delita Hooks contacted Oct. 16th to turn herself

in so Ms. Troy references a law suit against Chief CAMPISI and Internal Affairs.

See below:


Eric Sanders, a retired NYPD officer turned  civil rights attorney is representing a

female retired NYPD officer , Detective Shirley Page  who is suing Chief Campisi

and IAB:

"New York Civil Rights Attorney Eric Sanders, Esq., of The Sanders Firm, P.C., alleges in a $15 million Notice of Claim filing that the NYPD Internal Affairs Bureau is an inept racially and sexually charged corrupt 'Good Ole Boys' network operating without any real government oversight

According to the claim, Claimant Retired Detective Second Grade Shirley Pelage says that throughout her assignment in the Internal Affairs Bureau (IAB) from July 2, 1999, through her retirement April 13, 2013, under Police Commissioner Raymond W. Kelly and Bureau Chief Charles V. Campisi, the 'Bureau's' primary goals were to protect the 'image' of the department (Ms. Troy dubbed "The NYPD Brand") as opposed to rooting out police corruption that impacts the public safety particularly the African-American and other communities of color.

Pelage claims that IAB intentionally inhibits the oversight and monitoring of the department by the Commission to Combat Police Corruption; the New York City Civilian Complaint Review Board; as well as the District Attorneys of New York, Bronx, Queens, Kings and Richmond Counties, this is accomplished by frustrating the process of obtaining relevant or pertinent information by providing 'sanitized' or 'misleading' information thereby impacting the public safety particularly the African-American and other communities of color.

IAB intentionally misleads the public and jeopardizes the public safety by promoting an 'image' of openness and fairness in policing meanwhile covering up its own serious corruption problems.   Pelage claims that IAB is rife with problems of intentionally 'mishandling' police corruption cases; misusing public funds; misusing department equipment (radio motor patrol vehicles, cellular telephones, EZ Passes, helicopters, etc.), as well as racism, sexism, nepotism and cronyism......More importantly, Pelage claims that IAB uses a flawed and biased 'quota' system as a means to increasing its 'numbers' making it appear that they are being 'proactive' investigating police corruption when in fact, they are using such mechanisms as Integrity Tests (Random and Targeted), EDITS, AWARES and prisoner debriefings to intentionally 'suppress' the reported 'numbers' of police corruption and civilian complaints filed primarily by African-American Male civilians and employees' against Caucasian Male officers..

"Needless to say, the Internal Affairs Bureau is long overdue for a top-to-bottom review.  There is currently no viable meaningful mechanism available to protect the Civil Rights of the general public or NYPD employees from corrupt police officers." Eric Sanders says. "

Ms. Troy asks the NYPD to remove CPR "Courtesy" --- "Professionalism" -- "Respect" and "Protect and Serve" from all stationary and vehicles etc because it is false advertising until a Federal Monitor is brought in and Federal laws are changed to hold the NYPD accountable to actually "protect" and "serve" so People are not mislead.

The NYPD seems to have a need for a Commission every 20 years like the Mollen Commission and the Knapp Commission.  Ms. Troy states the Adrian Schoolcraft trial is the closest thing we have to a Commission.  Ms. Troy called up the Honorable retired Judge Mollen asking for his assistance in getting a new Commission for the NYPD.  The Honorable retired Judge Mollen told Ms. Troy she needs to get a mayor to appoint someone which is how his commission came to be.

Lenoard Levitt reminds readers of his column that Judge Mollen requested a permanent monitor be set in place and this never happened.

IAB Lt. Anges never returned Ms. Troy's calls and she suggests he is part of the Integrity Bureau rumored to be where IAB sends cases to die which is also implied in retired Detective Pelage's law suit against Chief Campisi and IAB.

### NYPD Coercion & Threats to Unlawfully Arrest Ms. Troy

On or about Tuesday, October 16, 2012, defendant VERGONA informed Ms. TROY he had just learned that Delita Hooks had filed a cross complaint against Ms. Troy.

Ignoring exculpatory video evidence of Ms. Hooks attacking Ms. TROY when

Delita Hooks could have easily closed the door but uses the door for balance to begin striking Ms. Troy , defendant VERGONA verbally abused and threatened Ms. TROY that she must either drop her charges against Ms. Hooks, or he would arrest her.    Det Vergona did state he would arrest both of them as if was some how equal all Ms. Troy was never even given the courtesy of a meeting with the NYPD unlike Delita Hooks her attacker.   Ms. Troy told IAB that she believes Det Vergona never contacted Ms. Hooks on Oct 16 to turn herself in after Ms. Troy agreed to be falsely arrested as the video, photo evidence and medical reports prove.

Defendant VERGONA thereby abused his lawful authority to by coercing Ms. TROY with the threat of unlawful imprisonment to relinquish her right to make a complaint regarding her victimization and to threaten Ms. TROY with unlawful arrest.

At that time, Ms. TROY decided not to drop the charges and to be arrested.

Det Vergona continued yelling at Ms. Troy insisting she turn herself in for arrest immediately.   Ms Troy responded a Judge would take one look at the assault video and he or she would throw out Det Vergona's false arrest and Ms. Troy would sue him.  Ms Troy agreed to what see deemed a "false arrest" and headed down to the First Precinct but realized she had a dental appointment to fix a chipped front tooth so she called Det. Vergona back.

Ms. TROY then offered to surrender to arrest that day at 3:00 p.m.

In response, defendant VERGONA represented to Ms. TROY that she must instead come to the station on Saturday, October 20, 2012 – four (4) days later – to be arrested, despite Ms. TROY's having informed him that that she is Jewish and Saturday is the Sabbath. Exercising his religious discrimination, defendant VERGONA refused to execute her arrest on any day other than Saturday.

Fearing her imminent incarceration, Ms. TROY suffered mental and emotional harms, depression, and lost body weight.   She was suppose to get her period on Oct. 20, 2012 but did not due to the rapid weight loss and duress suffered from preparing for false arrest.  Ms. Troy was greatly concerned about how to deal with imprisionment and frequent urination due to a collapse bladder from fibroid tumors which Det John Vergona was well aware of.

On   Saturday, October 20, 2012, Ms. TROY, through counsel, drop the charges because counsel was concerned for Ms.  Troy's health including serious damage to the left eye, diagnosed October 19th by Dr. Young as a detached retina symptoms flashing, lights and visual impairment like vaseline in eye, floaters developed believed to be from Delita Hooks yanking Ms. Troy's neck back as well as a neck brace from Ms. Hooks refusing to let go of Ms. Troy's hair pulling and yanking Ms. Troy's hair from the ground and Det Vergona was aware that Ms. Troy has a

collapsed bladder not from the assault but from fibroid tumors so Ms. Troy would have had to be asked to be moved to a hospital and be handcuffed to a bed with a bed pan under her or suffer great hardship which appeared to Det. Vergona's objective. Please read The United Nations definition on torture and coercion.

Ms. Troy's counsel advised Ms. Troy for her health to avoid the weekend stay and to drop charges which she did against her will immediately contacting Internal Affairs and CCRB. She told her lawyer she agreed to drop the assault charges if the receptionist (Delita Hooks name was withheld from her) dropped her ALLEGED charges. That is what Ms. Troy agreed to under great duress and hardship against her will but fearing even greater damage to her eye and health as well as concerns over complications from a collapsed bladder that would make a weekend in prison for being a victim of a violent assault at a medical office even harder to endure.

On Oct. 16th, Ms. Troy went to the First Precinct with a letter and an NYPD Pin Badge Number 285 honoring Lt. Giueseppe Petrosino, the first NYPD hero to die in the line of duty abroad in 1909. Ms Troy can be seen with Lt. Petrosino's limited edition pin in a YouTube she made honoring the hero at The NY Police Museum. She alerted DI Ed Winski, who was familiar with Ms. Troy's many peaceful protests including against Deutsche Bank and their treatment of her a visitor of OWS as well DB's history financing the building of Auschwitz and I

G Farben including Dr. Mengele as well as 2 peaceful protests against The Mercer Hotel and Henry Buhl harassing and displacing Veteran Vendors and artists. Ms. Troy only met DI Ed Winski once January 16, 2012 at Union Square honoring Dr. Martin Luther King, Jr. holding a banner with his image advocating for Hospitals for the People of NYC including in the West Village where St. Vincent's was and again DI Ed Winski was aware of Ms. Troy's peaceful participation as an activist.

The letter hand delivered to the First Precinct Tuesday evening on October 16, 2012 to DI Ed Winski alerted him she was going to be false arrested and she asked DI Ed Winski to be there Saturday when the further violation of Ms. Troy's rights would occur. Note: At the front desk where Ms. Troy handed in the letter is a large sign suggesting NYPD contact IAB of they note any corrupt dealings yet DI Ed Winski and all other officers involved or witness did not.   No NYPD officer expressed interest in arresting Ms. Troy Oct. 16 and kindly suggested Ms. Troy hold on to her Lt. Petrosino pin she values to greatly but instead Ms Troy wrote DI Edward Winski should give the pin to Commissioner Ray Kelly.

On November 18, 2012, Ms. TROY contacted defendant Deputy WINSKI leaving him a voice mail on his answering machine at work and informed him that a

crime had been committed in the First Precinct and Delita Hooks had walked in and filed false cross complaint.

On or around November 20, 2012, Ms. TROY informed defendants, IAB and Burgos of the incidents described supra.

At that time, Ms. TROY spoke with defendant Sergeant CHEN via the phone, and at his request, went to the 1st Precinct to file a complaint stating Delita Hooks filed a false cross complaint.   Sgt Chen agreed Ms. Troy had a right to file a complaint Delita Hooks filed a false cross complaint.    Sgt Chen said "You were the one assaulted at the doctor's office." It sound like he was trying to hold back laughter.    The assault Sgt Chen referred to was never included in the First Precinct's statistical report which Ms. Troy alleges is part of NYPD fixing statistical reports to make crime incidents appear lower than they are.    Please listen to the secretly recorded Adrian Schoolcraft Tapes and other NYPD officers who have courageously come forward to report on NYPD down grading crimes and creative policing that are red lights a new Commission is needed.

Ms. Troy recorded audio now on YouTube of NYPD Police Officer Migori turning Ms. Troy away not allowing her to file a complaint against Delita Hooks for filing a false cross complaint.   PO Migori did call Sgt Chen who refused to come downstairs and meet Ms. Troy to explain why he had suddenly decided she

could no longer file a complaint against Delita Hooks for filing a false cross complaint.

Ms. Troy also tried contacting DI Ed Winski via her cel phone calling him, CCRB and IAB from the First Precinct recording her calls.  She could not reach DI Ed Winski by phone so she wrote him a letter alerting him of what had just transpired and that she was prevented from making a complaint that Delita Hooks filed a false cross complaint.  Ms. Troy has a copy of the letter and than Sgt Schwartz demanded she leave The First Precinct rather than wait for DI Ed Winski to see her as he had just walked in to a meeting.  Ms. Troy put the audio of her being turned away and attempting to call DI Edward Winski as well as speaking with IAB and leaving a voice mail for her CCRB Inspector on YouTube and referred IAB to this audio as well.

 Ms. Troy consulted retired NYPD Captain Dr. Eterno, Phd, who responded it was egregious to turn Ms. Troy away.   They police officers should have taken the complaint.

In an effort to make a complaint against the NYPD, Ms. TROY immediately filed complaints the first with IAB Oct. 21, 2012 immediately after being coerced to drop charges by Det John Vergona.      When Ms. Troy followed up on her complaints she was informed an IAB NYPD sergeant Decker that everyone involved would be interviewed by IAB.   Ms. Troy told Sgt Decker that is what Det Vergona had said but to date it was not true as the NYPD had refused to interview her MD and assistant who broke in when Dr. Vine was with a patient to get Dr Vine to come to Ms. Troy.   Sgt Decker referred Ms. Troy to IAB AGNES and defendant AGNES about the incidents described supra.   IAB LT AGNES never returned Ms. Troy and too date she has never been interviewed by IAB investigators regarding what happened and Det John VERGONA repeatedly refusing to meet with her to see the injuries and Delita Hooks' Det DWYER never even contacting her.

However, upon information and belief, no investigation has been conducted by either the CCRB or the IAB.   CCRB turned the cases over to IAB despite Ms. Troy requesting they keep the cases and call the NYPD involved in so they would have to testify under oath versus the secrecy of IAB investigations. Ms. Troy gave stirring and powerful testimony how CCRB has failed way too many People.

Please see CCRB Public Meeting Wednesday, April 10, 2013 and read Ms. Troy's testimony available on CCRB's website and also on Scribd.

Ms. TROY has not been contacted by Internal Affairs or CCRB regarding this incident.     Ms. Troy has written and emailed Commissioner Kelly and Chief Campisi numerous times and also filed a series of complaints against IAB as well as specific IAB officers .

Because of the incidents described supra, Ms. TROY has suffered economic, emotional and special damages.  Ms. Troy's Father who relies on her for care and is a religious Jew attending an Orthodox Synagogue would have been devastated that his daughter who has never been in trouble in her life, a victim of a violent assault at a medical office where she was a patient seeking medical care was violently assaulted as video evidence proves by a medical receptionist   would have been falsely arrested and held over the Sabbath weekend.   Due to the seriousness of his health issues Ms. Troy feared for her health and even more damage to her eye if she was falsely held prisoner over Oct 20th weekend.  Ms Troy feared Det John VERGONA holding her prisoner could  have in fact killed her Father, 88 has serous heart issues and relies on daily phone calls many over

the weekend from Ms. Troy which due to health concerns he answers even on the

Sabbath.   Can someone please explain despite the shocking and disturbing video

evidence why Delita Hooks was not arrested and fired yet Ms. Troy clearly the

victim was threatened with a weekend arrest 19 days after she was violently

assaulted, a medical patient and as the video proves clearly the victim.

# United Nations Convention against Torture from Wikipedia:

## Definition of torture

Any act by which severe pain or suffering, whether physical or mental, is intentionally inflicted on a person for such purposes as obtaining from him or a third person, information or a confession, punishing him for an act he or a third person has committed or is suspected of having committed, or intimidating or coercing him or a third person, or for any reason based on discrimination of any kind, when such pain or suffering is inflicted by or at the instigation of or with the consent or acquiescence of a public official or other person acting in an official capacity. It does not include pain or suffering arising only from, inherent in or incidental to lawful sanctions.

— Convention Against Torture, Article 1.1

"The **Convention against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment (United Nations Convention against Torture)** is an international human rights instrument, under the review of the United Nations, that aims to prevent torture and cruel, inhuman degrading treatment or punishment around the world."

Ms. Troy could not focus on healing and medical care she needed and needs because the NYPD and IAB to date have never interviewed her in person meeting with her to investigate this violent crime and instead further victimized Ms. Troy and IAB's unwillingness to meet with Ms. Troy over 9

months later continues to cause Ms. Troy great distress.

 The NYPD and IAB role have also interfered with Ms. Troy effectively
focusing her energies on suing Dr Fagelman and Delita Hooks as her
energies are focused on Justice including the NYPD's role in fixing a
violent crime and violating her rights.  If the NYPD had done their job
rather than acted with bias, retaliation, and prejudice against Ms. Troy than
Ms. Troy could have fully focused on healing and medical care as well as
legal action fully and solely focused on Dr. Andrew Fagelman of 155 Spring
St and Delita Hooks of Queens, New York. The duress and upset have
added greater stress caring for her Father as well as herself.

Ms. Troy holds Internal Affairs accountable for their unwillingness to do
their job.  Delita Hooks had a meeting promptly with the NYPD yet to date
Ms. Troy has yet to be interviewed in person by anyone from The New York
Police department including Internal Affairs regarding the assault by Dr
FAgelman's receptionist office manager.  The only meetings Ms. Troy had
with IAB was regarding matters other than the assault including IAB's own
officers not Det John Vergona.

Ms. Troy asked for the inclusion of the United Nations definition of torture
as a reference for Det. John Vergona's decision to make her wait 4 days
for a false arrest despite video proving Delita Hooks threatened her with
bodily harm and began a violent attack holding the door Ms. Hooks could
have easily closed.   Det John Vergona's actions were to punish Ms. Troy
the victim for not obeying his verbal violent attack over the phone
commanding Ms. Troy to drop the charges which she repeatedly refused to
do.  Det Vergona repeatedly tried to coerce Ms. Troy in to dropping
charges and by Friday when Dr. Young found the hole Ms. Troy developed
a fear of further damage to her during her false arrest and fears she would
not get the medical care and safe environment she needed with serious
damage to her eye, her neck and a not related to the assault a collapsed
bladder from fibroid tumors.  Dr. Fagelman's employee had already
violated Ms. Troy's body and rights to a safe environment in a medical
office and due to Det Vergona's verbal violence and threats of false
imprisonment besides the eye and neck damage Ms. Troy's health further

declined also Det Vergona caused Ms.Troy further pain and suffering. Ms. Troy is still suffering greatly to date from both Det John Vergona and his partners actions which included such acts as making Ms. Troy hold for 10 minutes Oct. 4th and than mockingly being asked by Det Vergona's partner who's name she does not have are you still there.  Ms. Troy held and continued to politely ask please could she meet with Det John Vergona to show him the wounds to her eye, neck and defensive wounds to Ms. Troy.

Det John Vergona acted with extreme bias, prejudice and callousness towards Ms Troy who was the victim of a violent assault yet Det VERGONA never treated her as a victim of a crime.


Det John Vergona told Ms. Troy he did not work for her but for the New York Police Department.  Why did Delita Hooks get a meeting with the NYPD but Ms. Troy did not.  Det Vergona said the NYPD would not meet and interview the medical doctors because they did not witness the attack yet when Ms.Troy's private investigator via Ms. Troy's lawyer met with Dr. Fagelman and asked did you meet with the police Dr Fagelman responded no comment.   Ms. Troy has concerns that the NYPD gave Dr Fagelman special treatment as she witnessed the First Precinct giving The Mercer Hotel special treatment and Henry Buhl.


Additional harassment Tuesday March 19, 2013 Google YouTube notified Ms. Troy her YouTube: "Det John Vergona 01 Det. Squad Delita Hooks Assaults Me files false cross complaint no arrest!" was removed and and Friday, an additional copy of the same video was removed with Delita Hooks name for violating community guidelines.  Ms. Troy received her work back with an apology from Google YouTube during Passover Wednesday March 27, 2013 which Ms. Troy dubbed a Passover Miracle. Ms. Troy communicated to Google that she was a victim of a violent crime and removing the video was a Human Rights Violation.


Ms. Troy had a similar situation with mayor Bloomberg's NYPD Detectives Intelligence Division bodyguards when Ms. Troy yelled down mayor Bloomberg August 20th, 2012 at a press conference regarding CityTime and 911 Tech corruption. She stated 2 billion 14 million dollars and the 911 Tech System does not work properly.  Google YouTube told her the two videos one with NYPD Det Kevin Lynch and the other with Lt. O'Sullivan

violated their privacy in some way but Ms. Troy responded to Google YouTube that the videos were filmed on public streets and badge numbers are public domain.  Google YouTube again sided with her.  It should be noted Ms. Troy spoke to an FBI Agent August 20, 2012 asking the FBI for help getting an investigation into the 911 Tech system and Ms. Troy warned the 911 Tech System would collapse and it did during Hurricane Sandy along with 311 both tech systems Ms Troy calls the Tax Payer's Titanic like CityTime.   Ms. Troy has done her best to serve and protect the People of New York most especially regarding the 911 Tech corruption and this month July 2012 after Ms. Troy's testimony at City Hall on 911 continuing to demand an investigation Rose Gill Hearn has finally considered opening an investigation in to the 911 Tech corruption.

In The New York Observer, 9/29/09, Azi Paybarah wrote "Suzannah B. Troy" Won't Be Quieted" reporting Ms. Troy's YouTube channel was removed.  Ms. Troy lead at the forefront of the YouTube movement fighting mayor Bloomberg's third term, her first YouTube ever made, "Mayor Bloomberg King of New York" and predicting 6 months before the election not to believe what the media is reporting Mike Bloomberg may not win due to Voter Anger.  Ms. Troy was proven correct.  Mike Bloomberg barley won.  Again Google YouTube apologized and returned Ms. Troy's channel Suzannahartist.  Ms. Troy has an email from Scott Rubin of Google with an apology for the removal of her channel.

April 30, 2012  A Wikipedia page created to historically document Ms. Troy's YouTube channel being censored and removed and in a rare win for an activist returned by Google YouTube was first cyber vandalism similar in tone to the sock puppet accounts harassing Ms Troy on behalf of Delita Hooks and the NYPD including about this law suit and than the Wikipedia was deleted.  Before deletion every piece on Ms Troy's activism regarding the NYPD Rape Cops and DSK including photos of Ms .Troy in the Getty image and her YouTube documentary work and advocacy written up in the New York Times for Giuseppi Logan an elderly African American Jazz Musician and Composer were all deleted.  When the cyber vandalism the entire page was deleted with Wikipedia denying all vandalism and to date has yet to be restored.

Ms Troy's advocacy included for the NYPD on YouTube ended when  the

NYPD fixed Dr. Fagelman's receptionist/office manager Deilta Hooks
violent assault and false cross but prior Ms. Troy made numerous
YouTubes on behalf of the NYPD asking their pensions be protected, the
NYPD and FDNY and all rescue workers be honored down at the WTC site
and Memorial as well as the NYPD's starting salary not be lowered.

Everyone in the medical community that Ms. Troy has consulted along with
retired NYPD all say it's crazy.  No one can understand why Delita Hooks
has not been fired and arrested and the NYPD as well as Internal Affairs
role in this.

Ms. Troy suffers many symptoms of Post Traumatic Stress from Dr.
Fagelman's refusing to fire Delita Hooks violent attacks and Hooks lying
and blaming Ms. Troy, her co-workers involved pictured in the video, the
NYPD and IAB officers involved not all named in this law suits as their
names have been withheld  symptoms including severe insomnia, weight
gains, anxiety, and the need to hand out thousands of "Justice Cards".   Ms
Troy hands out cards telling what happened to her including the NYPD's
role and Dr. Fagelman's not firing Delita Hooks as well as Delita Hooks
lying and filing a false cross complaint another serious crimes and thanks
New Yorkers and all internet activists for their help driving the YouTube
views up on the assault video so that Dr. Fagelman, Delita Hooks, the
NYPD and IAB cannot ever do what they have done for 9 months again
which is prevent Delita Hooks from being arrested and from Ms. Troy
taking the case to the Manhattan DA.

Ms. Troy contacted the Attorney General Offices Investigations Unit and
asked for their help,  She was referred to the Manhattan DA's office.  The
AG's investigation unit believed that Ms. Troy could directly bring her case
to the DA but the DA's many units said Ms. Troy must wait for Internal
Affairs to contact the Manhattan DA.  To date IAB has yet to contact Ms.
Troy about the assault to interview her let alone contact the Manhattan DA.

Ms. Troy has filed a complaint against the Manhattan DA as well for failure
to meet with her regarding her assault as the Attorney General
Investigations Unit suggested the DA would but also for in Ms. Troy's
opinion failure to investigate John Liu's request for a criminal investigation

in to ECTP 911 Tech Corruption based on his most recent audit and press release "Mismanagement of 911 Upgrade Picked Tax Payer's Pocket" May 30th, 2012 as well as lack of a criminal investigation and prosecution of alleged St. Vincent's Hospital crooks that are allegedly why the hospital in the West Village went bankrupt.

Ms. Troy continues to hand out Justice Cards regarding the violent assault and the NYPD's role.  The Justice Cards, Ms. Troy tells New Yorkers are doing the job the NYPD should have done by arresting Delita Hooks and that is preventing her from doing this to another patient and the NYPD fixing this violent crime for her and Dr. Fagelman who did not fire her and paid her for her time berating Ms. Troy, violating Ms. Troy's patient rights and privacy and violently assaulting Ms .Troy causing serious damage to her eye and neck.

Another example of Ms. Troy's PTS is when her eye surgeon raised his arm for Ms. Troy to follow his hand to check her eye movements Ms. Troy cringed as if her medical surgeon was going to strike her.   A medical office is suppose to be a safe place and the same for a police precinct where New Yorkers are lead to believe they can come for safety, protection and assistance including investigating a crime.  The mayor's own spokes person in The NY Post article on DOT commissioner Kahn getting special treatment from the NYPD as told to the New York Post reporter by an honest NYPD officer exposing yet another example of NYC gov officials and NYPD's abuse of power urges New Yorkers to go to the police yet when Ms. Troy did she was continually rebuffed despite significant evidence she was the victim in a medical office.

The PTS  and insomnia from Dr. Fagelman's refusal to fire Delita Hooks, Delita Hooks actions and the NYPD and IAB continue to add  to Ms. Troy health issues and care need to heal her body and mind.   The fibroid tumors have grown in size adding to the terrible pressure she experiences from the tumors collapsing her bladder and Ms. Troy believes they have grown because she can't get the rest she needs for her body to heal.

Ms. Troy questions the need for 30 million dollar Tech System called "Domain Awareness" to put more video surveillance out on the streets to

catch crime when her own video prove of Dr. Fagelman's violent receptionist attacking her as horrified so many people left with this question, "Why wasn't Delita Hooks arrested?".

Domain Awareness is TARU on steroids and again the NYPD and even the Manhattan DA where exposed for prejudice and violation of OWS Michael Premo's civil rights false arresting him and putting him on trial when TARU video proved he was in fact innocent yet the Manhattan DA and the NYPD attempted to with hold the video which Democracy Now supplied a copy since their camera person was standing by the TARU officer.  The NYPD told the Judge the TARU office was on a special mission.  The Jury found Michael Premo not guilty.

What is the point of a 30 to 40 million dollar NYPD technology Domain Awareness and TARU when NYPD are not taking video evidence proving a violent assault like Ms. Troy's to the DA but using coercion to force a victim of a violent crime like Ms. Troy was at a doctor's office to drop charges?

"Kahn's Wave of Paranoia" April 20, 2013 Jamie Schram reports "City Transportatoin Commissioner Janette Sadik-Khan was so convinced her neighbor was spying on her family with a video camera that she pulled strings at One Police Plaza to get cops to search the man's apartment, law enforcement sources told The Post."  This is the tale of two cities but in the case of abuse of power reported by Ms. Sadik-Kahn, at least NYPD came forward as anonymous sources to expose Ms. Sadik-Kahn and the NYPD while in Ms.Troy's case despite the large poster at the front desk of the First Precinct urging officers to contact IAB, not one officer has come forward despite the video of Dr. Fagelman's employee Delita Hooks violently attacking Ms. Troy.  Not one NYPD officer from the Detective Squad would meet with Ms. Troy  despite the seriousness of her injuries including an eye so damaged without surgery Ms. Troy would have lost her vision as well as overwhelming evidence Delita Hooks assaulted Suzannah Troy who was clearly the victim but Commissioner Sadik-Khan was able to pull strings according to Jamie Schram's NYPD sources for what was an invasion of her neighbor's home and privacy.

Add this to perhaps the largest amount of false arrests of peaceful

protestors in public spaces, stop and frisks without just cause as Adrian Schoolcraft's secret audio's prove as well as other courageous officers like retired Det. Hernandez who left the department when he learned his fellow officers were down grading rape to Ms. Troy's attacker getting some strings pulled or deferment treatment because Ms. Hooks, Ms. Troy's attacker actually met with the NYPD and Ms. Troy the victim was not allowed to meet with investigating Det John Vergona.    Sgt Chen, supervisor of Det Vergona and Dwyer practically laughed over the phone,  stating to Ms. Troy, oh you were the one who got assaulted at the doctors office.  Ms Troy being a victim of an assault was never part of the First Precinct statical report.  Instead Ms. Troy was agreed twice to be false arrested as the video proves Delita Hooks complaint is false and Ms. Troy was coerced and treated with extreme prejudice only agreeing to coercion due to the severity of her injuries most especially her eye and neck.  Ms Troy was not able to seek the support that victims of crime are able to seek because the NYPD fixed her being violently assaulted as the video proves.

## FIRST CLAIM
## DEPRIVATION OF RIGHTS
## UNDER THE UNITED STATES CONSTITUTION THROUGH 42 U.S.C. § 1983

Ms. TROY incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

Defendants, under color of state law, subjected Ms. TROY to the foregoing acts and omissions, thereby depriving Ms. TROY of her rights, privileges and immunities secured by the United States Constitution, including, without limitation, deprivation of the following federal constitutional rights guaranteed through 42 U.S.C. § 1983:

(a) freedom from retaliation under the First Amendment;

(b) deprivation of the First Amendment right to petition for redress of grievances;

(c) freedom from the threat of lodging of false charges against her by police officers in violation of her rights to due process, under the Fifth and Fourteenth Amendments;

(d) freedom from fabrication of evidence against her under the Fifth and Fourteenth Amendments; and

(e) equal protection under the laws.

Defendants' deprivation of Ms. TROY's constitutional rights resulted in the injuries and damages set forth above.

## FAILURE TO INTERVENE
## IN CONSTITUTIONAL VIOLATIONS 42 U.S.C. § 1983

Ms. TROY incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

Members of the NYPD have an affirmative duty to assess the constitutionality of interactions between their fellow members of service and civilians and to intervene where they observe another member of the Police Department or other law enforcement agency violate a civilian's constitutional rights.

The defendants were present for the above-described incident and witnessed the defendants unlawfully refuse to conform their conduct to the legal standard and threaten

Ms. TROY with an unlawful arrest in deprivation of her First Amendment, Fourteenth

Amendment rights and other federal, state and common law rights.

Such conduct clearly without reasonable basis or other legal justification, and was

infected with discriminatory animus, and defendants failed to take any action or make

any effort to intervene, halt or protect Ms. TROY from such wrongful conduct.

The defendants' violations of Ms. TROY's constitutional rights by failing to intervene in

the conduct alleged herein resulted in the injuries and damages set forth above.

## CLAIM
## *MONELL* CLAIM AGAINST DEFENDANT CITY – 42 U.S.C. § 1983

Plaintiff TROY incorporates by reference the allegations set forth in all preceding

paragraphs as if fully set forth herein.

All of the acts and omissions by the individual defendants described above were carried

out pursuant to overlapping policies and practices of the City of New York which were in

existence at the time of the conduct alleged herein and were engaged in with the full

knowledge, consent, and cooperation and under the supervisory authority of the

defendant CITY and its agency, the NYPD.

Defendant CITY and the NYPD, by their policy-making agents, servants and employees,

authorized, sanctioned and/or ratified the individual police defendants' wrongful acts;

and/or failed to prevent or stop those acts; and/or allowed or encouraged those acts to

continue.

The acts complained of were carried out by the aforementioned individual defendants in their capacities as police officers and officials pursuant to customs, policies, usages, practices, procedures and rules of the CITY and the NYPD, all under the supervision of ranking officers of the NYPD.

The aforementioned customs, practices, procedures and rules of defendant CITY and the NYPD include, but are not limited to, the following unconstitutional practices: (a) abuse of authority to deprive citizens of their right to lodge complaints about a city agency, namely the NYPD; (b) failure to supervise, train, instruct and discipline police officers and encouraging their misconduct; (c) failure to intervene to prevent the above-mentioned practices when such could reasonably have been prevented by a supervisor or other agent or employee of the NYPD.

The existence of aforesaid unconstitutional customs and policies may be inferred from repeated occurrences of similar wrongful conduct, as documented in the following civil rights actions filed against the CITY and analogous prosecutions of police officers:

The existence of the above-described unlawful _de facto_ policies and/or well-settled and widespread customs and practices is known to, encouraged and/or condoned by supervisory and policy-making officer and officials of the NYPD and defendant CITY, including, without limitation, defendant KELLY.

The actions of the individual defendants involved in the incidents described _supra_ resulted from and were taken pursuant to the above-mentioned _de facto_ policies and/or

well-settled and widespread customs and practices of the CITY, which are implemented

by members of the NYPD, of engaging in systematic and ubiquitous perjury, both oral

and written, to cover-up federal law violations committed against civilians by either

themselves of their fellow officers, supervisors and/or subordinates. They do so with the

knowledge and approval of their supervisors, commanders and defendant KELLY who

all: (i) tacitly accept and encourage a code of silence wherein police officers refuse to

report other officers' misconduct or tell false and/or incomplete stories, inter alia, in

sworn testimony, official reports, in statements to the CCRB and the Internal Affairs

Bureau ("IAB"), and in public statements designed to cover for and/or falsely exonerate

accused police officers; and (ii) encourage and, in the absence of video evidence blatantly

exposing the officers' perjury, fail to discipline officers for "testilying" and/or fabricating

false evidence to initiate and continue the malicious prosecution of civilians in order to

cover-up civil rights violations perpetrated by themselves of fellow offices, supervisors

and/or subordinates against those civilians.

The foregoing acts by defendants deprived Ms. TROY of her federally protected rights.

Defendant CITY knew or should have known that the acts alleged herein would deprive

Ms. TROY of her rights under the First and Fourteenth Amendments to the United States

Constitution.

Defendant CITY is directly liable and responsible for the acts of the individual

defendants because it repeatedly and knowingly failed to properly supervise, train,

instruct, and discipline them and because it repeatedly and knowingly failed to enforce

the rules and regulation of defendant CITY and NYPD, and to require compliance with

the Constitution and laws of the United States.

Despite knowledge of such unlawful de facto policies, practices and/or customs, these

supervisory and policy-making officers and officials of the NYPD and the CITY,

including defendant KELLY, have not taken steps to terminate these policies, practices

and/or customs, do not discipline individuals who engage in such polices, practices and/

or customs, or otherwise properly train police officers with regard to the constitutional

and statutory limits on the exercise of their authority, and instead sanction and ratify these

policies, practices and/or customs through their active encouragement of, deliberate

indifference to and/or reckless disregard of the effect of said policies, practices and/or

customs upon the constitutional rights of persons in the City of New York.

Ms. TROY's injuries were a direct and proximate result of defendant CITY and the

NYPD's wrongful de facto policies and/or well-settled and widespread customs and

practices and of refusal to accept complaints and investigate into officer misconduct and

failure to properly supervise, train and discipline police officers.

**FOURTH CLAIM**
***RESPONDEAT SUPERIOR* LIABILITY OF THE CITY OF NEW YORK**
**FOR VIOLATIONS OF THE LAWS OF THE STATE OF NEW YORK**

Ms. TROY incorporates by reference the allegations set forth in all preceding paragraphs

as if fully set forth herein.

The conduct of the officer defendants alleged herein, occurred while they were on duty and in uniform, and/or in and during the course and scope of their duties and functions as NYPD officers, and/or while they were acting as agents and employees of defendant CITY, clothed with and/or invoking state power and/or authority, and, as a result, defendant CITY is liable to Ms. TROY for the officer defendants' common law torts pursuant to the common law doctrine of <u>respondeat superior</u>.

As a result of the foregoing, Ms. TROY was deprived of her rights to petition the government and to be free of retaliation for protected speech, and suffered psychological and emotional injury, costs and expenses, and was otherwise damaged and injured.

**FIFTH CLAIM**
**<u>VIOLATIONS OF THE CONSTITUTION OF THE STATE OF NEW YORK</u>**

Ms. TROY incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

Defendants' conduct alleged herein breached the protections guaranteed to Ms. TROY by the New York State Constitution, including freedom from retaliatory arrest, under the Article I, Section 8.

The deprivation of Ms. TROY rights under the New York State Constitution resulted in the injuries and damages set forth above.

**NINTH CLAIM**
**INTENTIONAL AND NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS**
**<u>UNDER THE LAWS OF THE STATE OF NEW YORK</u>**

Ms. TROY incorporates by reference the allegations set forth in all preceding paragraphs

as if fully set forth herein.

By the actions described above, defendants engaged in extreme and outrageous conduct, which intentionally and/or negligently caused severe emotional distress to Ms. TROY. The acts and conduct of the defendants were the direct and proximate cause of injury and damage to Ms. TROY and violated her statutory and common law rights as guaranteed by the laws and Constitution of the State of New York.

As a result of the foregoing, Ms. TROY was deprived of her rights to petition the government and to be free of retaliation for protected speech, and suffered psychological and emotional injury, costs and expenses, and was otherwise damaged and injured.

**TENTH CLAIM**
**NEGLIGENCE**
**UNDER THE LAWS OF THE STATE OF NEW YORK**

Ms. TROY incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

The defendants, jointly and severally, negligently caused injuries, emotional distress and damage to Ms. TROY.   The acts and conduct of the defendants were the direct and proximate cause of injury and damage to Ms. TROY and violated her statutory and common law rights as guaranteed by the laws and Constitution of the State of New York.

As a result of the foregoing, Ms. TROY was deprived of her rights to petition the government and to be free of retaliation for protected speech, and suffered psychological and emotional injury, costs and expenses, and was otherwise damaged and injured.

**ELEVENTH CLAIM**
**NEGLIGENT HIRING, SCREENING, RETENTION,**

## SUPERVISION, AND TRAINING
## UNDER THE LAWS OF THE STATE OF NEW YORK

Ms. TROY incorporates by reference the allegations set forth in all preceding paragraphs as if fully set forth herein.

Defendant CITY negligently hired, screened, retained, supervised, and trained defendants. The acts and conduct of the defendants were the direct and proximate cause of injury and damage to Ms. TROY and violated her statutory and common law rights as guaranteed by the laws and Constitution of the State of New York.

As a result of the foregoing, Ms. TROY was deprived of her rights to petition the government and to be free of retaliation for protected speech, and suffered psychological and emotional injury, costs and expenses, and was otherwise damaged and injured.

## JURY DEMAND

Ms. TROY demands a trial by jury in this action on each and every one of his damage claims.

*WHEREFORE* Ms. TROY demands judgment against the defendants individually and jointly and prays for relief as follows:
That she be compensated for violation of her constitutional rights, pain, suffering, mental anguish and humiliation; and

That she be awarded punitive damages against the individual defendants; and

That she be compensated for attorneys' fees and the costs and disbursements of this action; and

That the Court issue an Order declaring the officer-defendants' conduct herein to be in violation of Ms. TROY's rights under the First and Fourteenth Amendments to the federal constitution; and

For such other further and different relief as to the Court may seem just and proper.

Dated:   New York, New York
         July 15, 2013

                                    Respectfully submitted,


                           By: _____
                                    Suzannah B. Troy
                                    Brooklyn, NY 11211
                                    917 502 7958


                                    /20 N 7ᵗʰ St 2A

                                            11249-3055

PAGE

PAGE 16