

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Suzannah B. Troy,

                    Plaintiff,

        —v—

City of New York, et al.,

                    Defendants.

13-cv-5082 (AJN)

MEMORANDUM &
ORDER

ALISON J. NATHAN, District Judge:

This action arises from the investigation of a physical altercation between Plaintiff

Suzannah Troy and non-party Delita Hooks by police officers employed by the City of New

York ("City").  Plaintiff, proceeding *pro se*, brings this action against the City and individual

defendants Lieutenant Agnes, Lieutenant Burgos, Sergeant Chen, Detective Dwyer, IAB Chief

Campisi, Commissioner Kelly, Sergeant O'Donnell, and Deputy Inspector Winski, alleging that

Defendants violated the federal constitution, the state constitution, and state tort law.  Before the

Court is Defendants' motion to dismiss the complaint pursuant to Federal Rule of Criminal

Procedure 12(b)(6).  For the reasons that follow, the motion is granted.

**I.      Background**

The following facts are taken from the complaint and judicially noticeable documents.

*See Kramer v. Time Warner Inc.*, 937 F.2d 767, 773 (2d Cir. 1991) (holding that a district court

may "consider matters of which judicial notice may be taken" in deciding a motion to dismiss, so

long as such extrinsic documents are not relied upon for the truth of the matters asserted therein).

But the Court does not rely on factual assertions made for the first time in Plaintiff's opposition

brief, *see, e.g.,* Pl. Opp. 4 (asserting for the first time that Plaintiff spoke to Detective Del Pozo

1

about "witnessing a retired NYPD commander attempted [sic] to fix a ticket for Rudin Flunkie"),

as it is "axiomatic that the Complaint cannot be amended by briefs in opposition to a motion to

dismiss." *Muniz v. Morillo*, No. 06-cv-6570 (RJS), 2008 WL 4219073, at *6 (S.D.N.Y. Sept. 10,

2008) (quoting *O'Brien v. Nat'l Prop. Analyst Partners*, 719 F. Supp. 222, 229 (S.D.N.Y.

1989)).  Indeed, Plaintiff was advised and subsequently reminded of her right to amend the

Complaint in the face of the motion to dismiss, *see* Dkt. Nos. 29, 33, but declined to do so,

opting instead to rely on the Complaint and oppose the motion, *see* Dkt. No. 40.

### A.  Plaintiff's History of Activism

Plaintiff Suzannah Troy defines herself as an activist who has engaged in numerous

campaigns involving her local community and the NYPD.  Compl. 4.[1]  For example, Plaintiff

"worked with the NYPD and Parks Dept. to return the doors" to the Tompkins Square Park

women's restrooms in August 2009, published a letter in the New York Times advocating raising

the salaries of NYPD officers in 2004, and gave free massages to NYPD officers in the lobby of

her health club following September 11.  Compl. 5-7.  Plaintiff has also expressed more critical

views of the NYPD, such as by filing a grievance with the Supreme Court Committee related to

"the rape trial of NYPD PO Moreno aka the NYPD Rape Cop."  Compl. 8-9.

### B.  Altercation with Ms. Hooks

Plaintiff is a patient of Dr. Kathleen Vine.  Compl. 11.  At the time of the events

underlying this litigation, Dr. Vine shared offices and a reception area with Dr. Andrew

Fagelman, who employed and continues to employ receptionist Delita Hooks.  *Id.*  On October 1,

2012, Plaintiff stopped by a water cooler in the reception area of Dr. Vine's office on her way

out the door.  *Id.*  Upon noticing that the water cooler was stocked with Styrofoam cups, Plaintiff

---

[1] As Plaintiff's Complaint contains neither page nor paragraph numbers, the Court refers to the ECF page numbers printed on the top of the document.

turned to Ms. Hooks and asked, "Would you consider using paper cups instead of Styrofoam? It's better for the environment." *Id.*

While the exact sequence of the events that followed is not entirely clear from Plaintiff's complaint, Plaintiff appears to contend that Ms. Hooks reacted to Plaintiff's request by striking her desk, yelling at Plaintiff, getting up from her desk to approach Plaintiff in a threatening manner, and giving Plaintiff "the finger." Compl. 11-12. Plaintiff retreated to the hallway and began using her cell phone to record Ms. Hooks through the doorway of the office. *Id.* at 12 Plaintiff said to Ms. Hooks, "[W]ould you please give me the finger again, now I am filming." *Id.* Instead of closing the door to block Plaintiff's view, the Complaint alleges that Ms. Hooks continued to threaten Plaintiff, stating, "I will slap the crap out of you!" *Id.* According to the Complaint, Ms. Hooks then slapped Plaintiff's cell phone out of Plaintiff's hands, threw her shoe at Plaintiff, punched Plaintiff in the left eye, and dragged Plaintiff toward the elevator by pulling on Plaintiff's hair. *Id.* at 12-13. Plaintiff attempted to defend herself by making short jabs with her bags and her left arm, which was weak due to a recent medical procedure (Plaintiff's right arm was holding her cell phone, which she had apparently retrieved). *Id.* at 13. The attack allegedly culminated with Ms. Hooks pressing her bare foot against Plaintiff's groin while pulling on Plaintiff's hair so that Plaintiff was "bent over like a bridge." *Id.* at 13-14. Ms. Hooks' co-workers and friends were ultimately able to put a stop to the altercation, and Ms. Hooks returned to her desk. *Id.* at 14-15.

### C. Investigation of Altercation

Immediately after leaving Dr. Vines' office on October 1, 2012, Plaintiff attempted to file a complaint with the 1st Precinct of the New York Police Department by telephone. Compl. 15.

When nobody answered her call, she walked to their office and lodged her complaint in person. *Id.*; Nam Decl. Ex. B (Omniform System Complaint Report) ("Complaint Report").

 Three days later, on October 4, Detective John Vergona called Plaintiff regarding her complaint. Compl. 18. During their conversation, Plaintiff described the altercation, revealing that she had told the following joke in the doctor's office just before being attacked: "Thank you, I'll see you next summer, and if I can afford injections then I'll get them to attract younger men." *Id.* at 21. Plaintiff alleges that this statement caused Detective Vergona to "develop[] a misogynistic attitude towards [her]." *Id.* Detective Vergona informed Plaintiff that he would visit Dr. Vine's office on the following Monday, October 8, to investigate. *Id.* Despite this assurance, Detective Vergona did not visit Dr. Vine's office. *Id.*

Later that same day, Plaintiff called Detective Vergona to provide additional information regarding her case. Compl. 21. Despite Plaintiff's multiple requests, Detective Vergona refused to meet Plaintiff in person to examine her injuries. *Id.* Detective Vergona said to Plaintiff, "I DON'T CARE IF YOU HAVE TWO BLACK EYES. STOP BABBLING." *Id.* at 21-22. At some point, Detective Vergona told Plaintiff that he would not interview Dr. Fagelman or Dr. Vine because they had not witnessed the altercation. *Id.* at 27. After these initial phone calls, Plaintiff sent Detective Vergona corroborating evidence, including the video recording of the attack, a medical report from Plaintiff's primary care physician documenting her injuries, and photographs of her injuries. *Id.* at 18-19. The photographs of Plaintiff's injuries were attached to her complaint file. *See* Nam Decl., Ex. C.

Three days later, on October 7, Plaintiff emailed Detective Vergona to inform him of vulgar and threatening comments that had been left on the video of the altercation, which

Plaintiff had uploaded to YouTube. Compl. 23. Detective Vergona never discussed this email with Plaintiff. *Id.*

On October 11, Plaintiff called the 1st Precinct and spoke with Detective Del Pozo in order to request that charges be brought against Ms. Hooks. Compl. 29.

On October 13, Detective Vergona emailed Plaintiff to inform her that he would visit Dr. Fagelman's office the following Monday, October 15, and requesting that she call him that afternoon. Compl. 29. Detective Vergona did not visit Dr. Fagelman's office on October 15, and, furthermore, refused to take Plaintiff's call that afternoon. *Id.* at 29-30.

On October 16, Detective Vergona called Plaintiff to inform her that Ms. Hooks had filed a cross-complaint against her on October 2. Compl. 36. Plaintiff was surprised, as she had not been contacted by the detectives assigned to Ms. Hooks' complaint. *Id.* at 21. Unlike Plaintiff, who was never able to meet with Detective Vergona in person, Ms. Hooks "had a meeting promptly with the NYPD" following the filing of her cross complaint. *Id.* at 46.

Detective Vergona further informed Plaintiff that, if Plaintiff did not drop her complaint against Ms. Hooks, both Plaintiff and Ms. Hooks would be arrested. Compl. 37. Faced with this choice, Plaintiff told Detective Vergona that she would rather be arrested. *Id.* Detective Vergona demanded that Plaintiff turn herself in immediately. *Id.* Although Plaintiff initially agreed to do so, she subsequently realized that she had a conflicting dentist appointment and called Detective Vergona back to reschedule, offering to turn herself in that afternoon at 3 pm instead. *Id.* at 37-38. Detective Vergona rejected this offer, telling Plaintiff that she should turn herself on October 20, which was a Saturday. *Id.* at 38. Plaintiff objected that she was Jewish and Saturday was the Sabbath, but Detective Vergona refused to reconsider. *Id.*

Plaintiff's impending incarceration caused her to experience mental, emotional, and physical distress. Compl. 38. In particular, Plaintiff was concerned that she would be unable to cope with an existing urinary condition while in prison, which was caused by a collapsed bladder and fibroid tumors. *Id.* at 38. Fearing for her health, Plaintiff, acting through counsel, agreed to withdraw her complaint against Ms. Hooks in exchange for Ms. Hooks doing the same. *Id.* at 38-39.

### D. Concerns Regarding Investigation

Plaintiff came to suspect that she was being treated unfairly by Detective Vergona and other officers in the 1st Precinct, and she reported these concerns to other authorities during and after the investigation of her complaint. For example, Plaintiff contacted IAB regarding her complaint against Ms. Hooks, such as by sending them medical records documenting her injuries from the altercation. Compl. 19. Plaintiff also contacted IAB regarding the harassing comments she received on the video of the attack posted to YouTube. *Id.* at 24. Although IAB initially told Plaintiff that they would investigate, they subsequently refused to do so upon discovering that the comments had not been left by police officers. *Id.*

On October 9, Plaintiff sent then-Commissioner Kelly a package informing him of the NYPD's continued failure to investigate her case, and proposing a series of film festivals called "Project Peace to the Street, Project Hope." Compl. 24-25. Commissioner Kelly never responded. *Id.* at 25. Commissioner Kelly also failed to respond to Plaintiff's request for the badge numbers of Detective Vergona and an officer identified as Sergeant Chen, as did Chief Campisi, Deputy Edward Winski, Sergeant O'Donnell, the Civilian Complaint Review Board, IAB, the detective squad, and the front desk of the 1st precinct. *Id.* Plaintiff encountered similar difficulty ascertaining the identities of Detective Andy Dwyer and his partner, the police officers

6

assigned to investigate Ms. Hooks' cross-complaint: the CCRB, IAB, and "NYC Gov
Commission to Combat Police Corruption" all refused to identify the officers or give her their
badge numbers. *Id.*

Plaintiff's concerns were only exacerbated by the events surrounding her decision to drop
her complaint against Ms. Hooks, and on October 21, Plaintiff contacted IAB to complain that
she had been "coerced to drop charges by Det John Vergona." Compl. 43. IAB Sergeant Decker
told Plaintiff that everybody involved would be interviewed, and referred her to IAB Lieutenant
Agnes. *Id.* However, Lieutenant Agnes never returned Plaintiff's call, and Plaintiff was not
interviewed by IAB regarding Detective Vergona's conduct. *Id.* Plaintiff later attempted to
report Detective Vergona to the CCRB, but they directed her to IAB against her wishes. *Id.*

At some point, Plaintiff "contacted the Hate Crimes Units . . . regarding her allegations of
Det VERGONA delaying her unlawful arrest until Saturday, Oct. 20, 2012 and refusing to
explain why she had to wait 4 days until the Sabbath." Compl. 32-33. Detective Sanchez from
the Hate Crimes Unit directed Plaintiff to file a complaint with a local precinct, and Plaintiff
attempted to file such a complaint at the 9th Precinct. *Id.* at 33. She was turned away and
directed to IAB instead. *Id.* Plaintiff filed a complaint with IAB regarding Detective Vergona's
"anti-Semitism as well as misogyny," but again received no response. *Id.*

On November 18, Plaintiff contacted Deputy Winski to "inform[] him that a crime had
been committed in the First Precinct and [Ms. Hooks] had walked in and filed [a] false cross
complaint." Compl. 40-41. Two days later, on November 20, Plaintiff made similar reports to
IAB and Lieutenant Burgos. *Id.* at 41

Plaintiff also attempted to file a complaint regarding Ms. Hooks' allegedly false cross
complaint with the 1st Precinct. Compl. 41. Although Sergeant Chen had told Plaintiff that she

7

could do so over the telephone, he refused to speak with her when she came to the station, and Officer Migori turned her away. *Id.* at 41-42. Plaintiff later tried contacting Detective Winski regarding Ms. Hooks' false cross complaint, but she was unable to reach him by telephone, and she was turned away by Sergeant Schwartz when she tried to meet Detective Winski at his office. *Id.* at 42.

At some point, Plaintiff retained a private investigator. *See* Compl. 26-27. Plaintiff's private investigator asked Dr. Fagelman, Ms. Hooks' employer, whether he had spoken to the police. *Id.* at 27. Dr. Fagelman responded, "No comment." *Id.* Plaintiff interpreted this to mean that Dr. Fagelman may have been interviewed in support of Ms. Hooks' cross-complaint. *Id.*

### E. Damages

Plaintiff "suffers many symptoms of Post Traumatic Stress" from Dr. Fagelman's refusal to fire Ms. Hooks, Ms. Hooks' blaming Plaintiff for the attack, the attack itself, and the NYPD and IAB officers' refusal to investigate her claims. Compl. 49. Her symptoms include insomnia, weight gain, and anxiety. *Id.*

### F. Complaint

Plaintiff's Complaint brings claims against the City of New York and police officers Lieutenant Agnes, Lieutenant Burgos, Sergeant Chen, Detective Dwyer, IAB Chief Campisi, Commissioner Kelly, Sergeant O'Donnell, and Deputy Inspector Winski, alleging violation of the following constitutional rights, pursuant to 42 U.S.C. § 1983: (1) the right to be free from retaliation under the First Amendment; (2) the First Amendment right to petition for redress of grievances; (3) "freedom from the threat of lodging false charges . . . by police officers in violation of [Plaintiff's] rights to due process, under the Fifth and Fourteenth Amendments";

(4) "freedom from fabrication of evidence against her under the Fifth and Fourteenth Amendments"; (5) equal protection; and (6) failure to intervene.  Plaintiff further alleges that the City is liable for these constitutional violations because they "were a direct and proximate result of [its] wrongful de facto policies and/or well-settled and widespread customs and practices and of refusal to accept complaints and investigate into officer misconduct and failure to properly supervise, train and discipline police officers."  Compl. 57.

Plaintiff also brings the following state law claims: (1) *respondeat superior* liability for the City; (2) violation of the New York State Constitution's guarantee of "freedom from retaliatory arrest, under the Article I, Section 8"; (3) intentional and negligent infliction of emotional distress; (4) negligence; and (5) negligent hiring, screening, retention, supervision and training by the City.  Compl. 59-60.

Plaintiff requests that "she be compensated for violation of her constitutional rights, pain, suffering, mental anguish and humiliation," and that she be awarded punitive damages and attorneys' fees and costs.  Compl. 60.

## II.    Legal Standard

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Hogan v. Fischer*, 738 F.3d 509, 514 (2d Cir. 2013) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)).  In this context, a claim is plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (quoting *Iqbal*, 556 U.S.at 678).  While this standard "is not akin to a 'probability requirement,'" it does demand "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)).  When applying this

9

standard to a complaint filed by a *pro se* litigant, the Court must construe the complaint

"liberally with 'special solicitude' and interpret[] [it] to raise the strongest claims that it

suggests." *Hogan*, 738 F.3d at 515.  However, a litigant's *pro se* status does not relieve her of

the requirement that her complaint "state a plausible claim for relief." *Id.*

### III.   Discussion

#### A. Failure to Investigate

It is well established that "[t]here is . . . no constitutional right to an investigation by

government officials." *Stone v. Dept. of Investigation of City of New York*, No. 91-cv-2471

(MBM), 1992 WL 25202, at *2 (S.D.N.Y. Feb. 4, 1992); *accord Harrington v. Cnty. of Suffolk*,

607 F.3d 31, 35-36 (2d Cir. 2010).  This is because "the duty to investigate criminal acts (or

possible criminal acts) almost always involves a significant level of law enforcement discretion,"

and individuals accordingly have no "'legitimate claim of entitlement' to a police investigation."

*Harrington*, 607 F.3d at 35 (citing *Town of Castle Rock v. Gonzales*, 545 U.S. 748, 760 (2005)).

This rule requires that Plaintiff's claims be dismissed to the extent that they are based on

various defendants' failure to investigate.  In Plaintiff's own words, she has brought suit against

defendants Campisi, Kelly, Winski, and Sergeant Chen because of their "failure . . . to properly

investigate or intervene based on plaintiff's reports of Detective Vergona threatening her with an

unlawful arrest." Pl. Opp. 15.  Likewise, Plaintiff's only allegations against Agnes, Burgos,

Dwyer, and O'Donnell's are that they failed to act in response to Plaintiff's complaints. *See,*

*e.g.,* Compl. 43 (alleging that Agnes failed to contact Plaintiff regarding Defendant Vergona's

misconduct), 25 (alleging that Burgos never responded to her email), 18 (alleging that Dwyer

failed to "contact[] [Plaintiff] to interview her"), 28 (alleging that O'Donnell "was not interesting

in investigating why [Plaintiff] would drop charges").  Even Plaintiff's claims against Detective

Vergona are, to a significant extent, based upon his failure to adequately investigate her complaint against Ms. Hooks. *See, e.g.,* Compl. 17 (alleging that "Detective Vergona never went to the medical office to interview everybody as he said he would"). Accordingly, Plaintiff's claims against defendants Agnes, Burgos, Campisi, Chen, Dwyer, Kelly, O'Donnell, and Winski must be dismissed for failure to state a claim, as must Plaintiff's claims against Detective Vergona, to the extent they are predicated on his failure to investigate her complaint against Ms. Hooks.

### B. First Amendment

Plaintiff alleges that that Defendants deprived her of her First Amendment rights to be free from retaliation and to "petition for redress of grievances." Compl. 52-53. While the Complaint fails to identify either what has been done to Plaintiff that violates these rights, or which defendants were responsible for that action, the Court construes Plaintiff to allege that she engaged in conduct protected by the First Amendment by filing a police complaint against Ms. Hooks and engaging in various forms of political activism, and that Detective Vergona unlawfully retaliated against Plaintiff for these exercises of her First Amendment rights by rudely telling her to "stop babbling," and by informing Plaintiff that she herself would face arrest if she proceeded with her complaint against Ms. Hooks. *See* Pl. Opp. 18-19 (citing these allegations in the complaint as the basis for her First Amendment claim). For the reasons that follow, Plaintiff's First Amendment claims are dismissed.

### 1. Rude Comment

Plaintiff's opposition brief makes clear that her First Amendment claim is based, in part, on Detective Vergona's having told her to "stop babbling" during their October 4, 2014, telephone conversation. *See* Pl. Opp. 19; Compl. 21-22. However, any such claim must be

dismissed out of hand, as "[m]ere rudeness or inconvenience, however unpleasant," cannot give rise to an injury cognizable under the First Amendment. *Batista v. Rodriguez*, 702 F.2d 393, 398 (2d Cir. 1983) (finding that administrative tribunal's rude treatment of plaintiffs did not violate the First Amendment). To otherwise "suggest that rude and inconsiderate treatment of complainants . . . is prohibited by the First Amendment is to trivialize the significance of the right to petition the government, making of the Constitution a font of tort law, and converting federal courts into small-claims tribunals." *Id.* (quotation marks omitted omitted). *Cf. Schroeder v. Dept. of Veterans Affairs*, No. 08-cv-351 (MRK), 2009 WL 1531953, at *1-2 (D. Conn. June 1, 2009) (finding that plaintiff's allegation that defendant personnel had "hung up on him when he called to check on his claim" was insufficient to state a claim for any constitutional violation). Accordingly, Plaintiff's claim is dismissed to the extent that it is based upon Detective Vergona's rude comment.

## 2. Threat to Arrest

The Court turns to consider Plaintiff's claim that Detective Vergona retaliated against her for her exercise of First Amendment rights—in particular, her complaint against Ms. Hooks, her past "political activity, . . . and [her] attempts to expose Defendant Vergona's unlawful threats of false arrest," Pl. Opp. 18-19[2]—by threatening to arrest her. In order to state a claim for retaliation in violation of the First Amendment, a plaintiff must allege: "(1) [she] has an interest protected by the First Amendment; (2) defendants' actions were motivated or substantially caused by [her] exercise of that right; and (3) defendants' actions effectively chilled the exercise of [her] First Amendment Right." *Curley v. Vill. of Suffern*, 268 F.3d 65, 73 (2d Cir. 2001).

---

[2] In this section, Plaintiff also argues that she was subjected to selective treatment "for . . . being a Jewish woman." Pl. Opp. 18. The Court construes these claims as sounding in Equal Protection, and they are addressed separately below. *See infra* § III.D.

With respect to the third prong of this standard, a plaintiff who, like Ms. Troy, proceeds in her capacity as a private citizen (as opposed to a public employee or prisoner) must show that her speech has actually been chilled as a result of the retaliatory conduct, or that she has suffered some other concrete harm sufficient to confer standing. *See Zherka v. Amicone*, 634 F.3d 642, 645-46 (2d Cir. 2011) ("Hurt feelings or a bruised ego are not by themselves the stuff of constitutional tort."). It is undisputed Plaintiff engaged in conduct protected by the Petition Clause by filing a complaint against Ms. Hooks, *see Estate of Morris ex rel. Morris v. Dapolito*, 297 F. Supp. 2d 680, 692 (S.D.N.Y. 2004) ("[I]t is axiomatic that filing a criminal complaint with law enforcement officials constitutes an exercise of the First Amendment right" to petition government for the redress of grievances.") (quotation marks omitted), lodging complaints regarding the allegedly deficient investigation of that complaint, and engaging in political activism, *see* Compl. 4-11. The Court therefore focuses its attention upon the second and third prongs of the test.

The Court finds that Plaintiff has failed to adequately plead that Detective Vergona's threat to arrest her was motivated or substantially caused by the exercise of her First Amendment Rights. Plaintiff alleges that, "[o]n or about Tuesday October 16, 2012, defendant VERGONA informed [Plaintiff] that he had just learned that Delita Hooks had filed a cross complaint against [her]," and that Detective Vergona immediately thereafter informed "[Plaintiff] that she must either drop her charges against Ms. Hooks, or he would arrest her." Compl. 36-37. These allegations cannot plausibly be understood to support the inference that Detective Vergona threatened to arrest Plaintiff in retaliation for her exercise of her right to petition—which Plaintiff had exercised over two weeks before, on October 1. *See* Compl. 15. Nor can they plausibly—or even conceivably—support the inference that Detective Vergona threatened to

13

arrest Plaintiff in retaliation for her "attempts to expose Detective Vergona's unlawful threats of false arrest," *see* Pl. Opp. 18-19, as the allegedly retaliatory threat preceded Plaintiff's efforts to expose it. The Court further finds that Plaintiff has failed to plead any facts connecting Detective Vergona's threat to her past activism. Rather, the only plausible inference raised by Plaintiff's allegations is that Detective Vergona's threat was motivated by Ms. Hooks' cross complaint, of which he had just learned. *Cf. Curley*, 268 F.3d at 69-70, 73 (finding that arrest based upon complaint by putative victim was not motivated or substantially caused by plaintiff's exercise of First Amendment rights).

Also fatal to Plaintiff's claim is her failure to plead that her speech was "actually chilled" by the threat. As Plaintiff's Complaint makes clear, Plaintiff continued to exercise her First Amendment rights to complain of both the altercation with Ms. Hooks and the NYPD's failure to investigate that altercation after the threat—including by filing a complaint with IAB, *see* Compl. 43, 41, and contacting the Hate Crimes Unit, *see* Compl. 32-33. Nor has Plaintiff alleged that she suffered any other concrete, constitutionally cognizable harm, such as the revocation of a building permit. *See Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 91 (2d Cir. 2002). The absence of any such allegation further precludes Plaintiff from stating a claim for retaliation in violation of the First Amendment. *See Zherka*, 634 F.3d at 645-46 (affirming dismissal of First Amendment retaliation claim where plaintiff had failed to allege actual chilling or "other form[] of tangible harm"). Because Plaintiff has thus failed to plead facts sufficient to satisfy the second and third prongs of the standard for unconstitutional retaliation in violation of the First Amendment, these claims are dismissed.

14

## C.  Threat to Lodge False Charges and Fabrication of Evidence

Plaintiff next alleges that Defendants violated her due process rights to "freedom from the threat of lodging false charges . . . by police officers" and "freedom from fabrication of evidence against her under the Fifth and Fourteenth Amendments." Compl. 53.  The Court construes the Complaint to allege that Plaintiff was unconstitutionally deprived of liberty on the basis of Ms. Hooks' allegedly false cross complaint.

"It is firmly established that a constitutional right exists not to be deprived of liberty on the basis of false evidence fabricated by a *government officer*." *Zahrey v. Coffey*, 221 F.3d 342, 355 (2d Cir. 2000) (emphasis added).  However, Plaintiff has failed to plead facts plausibly stating such a claim: she alleges that the "false cross complaint" was filed by Ms. Hooks, Compl. 10, who is a receptionist for a doctor in private practice, and not a government officer. *Cf. Chodkowski v. City of New York*, No. 06-cv-7120 (LBS), 2007 WL 2717872, at *9 (S.D.N.Y. Sept. 11, 2007) ("[P]roviding false information to the police does not make a private individual a state actor and liable under § 1983.").  Nor has Plaintiff alleged that government officers caused, pressured, or otherwise participated in the filing of the false cross complaint. *Cf. Blake v. Race*, 487 F. Supp. 2d 187, 216-17 (E.D.N.Y. 2007) (denying summary judgment where there was "an issue of fact as to whether the defendant [officers] participated in the alleged fabrication of evidence" by coaching informant to give false testimony).  This failure to plead that the false cross complaint was created by a government actor requires that Plaintiff's claim be dismissed.

But even if Plaintiff had adequately pleaded that the false cross complaint was fabricated by a government officer, her claim would fail because she has failed to plead that she was deprived of liberty as a result of the fabricated evidence.  As the Second Circuit emphasized in *Zahrey*, "[t]he manufacture of false evidence, 'in and of itself,' . . . does not impair anyone's

liberty, and therefore does not impair anyone's constitutional right." 221 F.3d at 348.  Plaintiff

does not plead that she was deprived of her liberty as a result of Ms. Hooks' false cross

complaint—to the contrary, her Complaint plainly alleges that she was *not* arrested.  *See* Compl.

38.  Nor has Plaintiff otherwise alleged that she was deprived of any protected interest.  *Cf.*

*Rolon v. Henneman*, 517 F.3d 140, 148-49 (2d Cir. 2008) (affirming dismissal of claim where

plaintiff had alleged that he had been deprived of overtime pay as a result of evidence fabricated

by government officers, where the plaintiff failed to allege that "he had a legitimate claim to

overtime" sufficient to establish a protected property interest).  Thus, even accepting Plaintiff's

allegations as true and drawing reasonable inferences in her favor, she has failed to state a claim

for unconstitutional fabrication of evidence, and her claim is accordingly dismissed.

### D.  Equal Protection

Plaintiff further alleges that Defendants have violated her right to equal protection of the

laws.  Compl. 53.  The Court construes Plaintiff's Complaint to allege that Plaintiff was

subjected to unequal treatment because of her gender and religion, and that, in particular,

Detective Vergona refused to investigate Plaintiff's complaint and threatened to arrest Plaintiff

because she is a woman and because she is Jewish.  *See* Compl. 21 (stating that "defendant

VERGONA . . . develop[ed] a misogynistic attitude toward [Plaintiff]); Compl. 38 (alleging that

Detective Vergona "[e]xercise[ed] his religious discrimination" by "refus[ing] to execute

[Plaintiff's] arrest on any day other than Saturday").  This claim too must be dismissed.

The Equal Protection Clause "is essentially a direction that all persons similarly situated

should be treated alike," *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985), and

it is violated when the government selectively denies government services to disfavored

minorities, *see Deshaney v. Winnebago Cnty. Dept. of Soc. Servs.*, 489 U.S. 189, 197 n.3 (1989).

16

In order to establish a denial of equal protection on the basis of selective treatment, a plaintiff must allege: (1) "compared with others similarly situated, [she was] selectively treated," and (2) "the selective treatment was motivated by an intention to discriminate on the basis of impermissible considerations," such as gender or religion. *Mosdos Chofetz Chaim, Inc. v. Vill. of Wesley Hills*, 815 F. Supp. 2d 679, 692 (S.D.N.Y. 2011) (quoting *Zahra v. Town of Southold*, 48 F.3d 674, 683 (2d Cir. 1995)). "To establish such intentional or purposeful discrimination, it is axiomatic that a plaintiff must allege that similarly situated persons have been treated differently." *Gagliardi v. Vill. of Pawling*, 18 F.3d 188, 193 (2d Cir. 1994) (citing *Cleburne*, 473 U.S. at 439).

Any equal protection claim brought on the basis of Detective Vergona's threat to arrest Plaintiff is foreclosed by Plaintiff's failure to allege that she was treated differently than another who was similarly situated. To the contrary, Plaintiff alleges that "Det. Vergona did state he would arrest both [Plaintiff and Ms. Hooks]." Compl. 37. As previously discussed, "'[a] showing that the plaintiff was treated *differently* compared to others similarly situated' is a 'prerequisite' and a 'threshold matter' to a selective treatment claim." *Mosdos Chofetz Chaim*, 815 F. Supp. 2d at 692 (quoting *Church of the Am. Knights of the Ku Klux Klan v. Kerik*, 356 F.3d 197, 210 (2d Cir. 2004)) (emphasis added). Plaintiff's allegation that she was treated just like Ms. Hooks when threatened with arrest by Detective Vergona therefore precludes her from stating a claim for violation of equal protection on that basis.

Plaintiff does, however, allege that she was subjected to selective treatment with respect to the investigation of her complaint.[3] For example, Plaintiff alleges that "[Ms.] Hooks had a

---

[3] While the Constitution provides individuals with no affirmative right to an investigation of their claims by the government, it does prohibit the government from treating individuals unequally when determining which claims to investigate. *See Myers v. Cnty. of Orange*, 157 F.3d 66 (2d Cir. 1998) (finding that municipal policy of investigating only first-filed complaints and prohibiting cross-complaints violated the Equal Protection Clause).

meeting promptly with the NYPD yet to date [Plaintiff] has yet to be interviewed in person by anyone from [NYPD] . . . regarding" their altercation, Compl. 46, and speculates that Dr. Fagelman was interviewed during investigation of Ms. Hooks' cross-complaint, *see* Compl. 27. But even assuming that she was treated differently than Ms. Hooks with respect to the investigation of her complaint, Plaintiff has not adequately pleaded that this differential treatment was based upon her gender or religion.

As an initial matter, any claim that Plaintiff was treated differently on the basis of her gender must fail as she and Ms. Hooks are both women. This conclusion is not altered by consideration of the allegation that Plaintiff told Detective Vergona a joke about "afford[ing] injections . . . to attract younger men," which Plaintiff believes caused Detective Vergona to "develop[] a misogynistic attitude towards [her]." Compl. 21. While mindful of its obligation to construe Plaintiff's complaint liberally to raise the strongest arguments it suggests, *see DiPetto v. U.S. Postal Serv.*, 383 F. App'x 102, 103 (2d Cir. 2010), the Court must nevertheless conclude that Plaintiff's speculation regarding the effect of her own gender related joke on another is insufficient to "nudge[]" her claim of gender-based discrimination "across the line from conceivable to plausible," *Iqbal*, 556 U.S. at 683.

Nor has Plaintiff plausibly alleged that the differences between the NYPD's treatment of Ms. Hooks and herself are attributable to Plaintiff's religion. For one thing, Plaintiff has not pleaded that Ms. Hooks belongs to a different religion than Plaintiff. Moreover, Plaintiff pleads that she informed Detective Vergona that she was Jewish *after* the alleged unequal treatment— *i.e.* the deficient investigation—had already occurred. Specifically, Plaintiff alleges that, October 16, 2012, shortly after she was threatened with arrest and more than a week after Detective Vergona had refused to meet her in person, Plaintiff contacted Detective Vergona to

18

reschedule her arrest for later that afternoon due to a conflicting dental appointment. Compl. 37, 21. It was during this later conversation that Plaintiff informed Detective Vergona that she was Jewish. *See* Compl. 38. In other words, the allegedly discriminatory conduct occurred *before* Detective Vergona learned of Plaintiff's religion. Intent to discriminate on the basis of religion cannot plausibly be inferred from such allegations, and Plaintiff's equal protection claim must therefore be dismissed.

### E.  Failure to Intervene

The Court turns to Plaintiff's claim that certain defendants "witnessed the defendants unlawfully refuse to conform their conduct to the legal standard and threaten [her] with unlawful arrest in deprivation of her First Amendment, Fourteenth Amendment rights and other federal, state and common law rights." Compl. 53-54. The Court construes Plaintiff to allege that the individual defendants other than Detective Vergona failed to intervene in order to prevent the alleged injuries to her First and Fourteenth Amendment rights. As set forth above, this claim essentially consists of an allegation that these other defendants failed to investigate her complaints—conduct which is not barred by the Constitution. *See supra* § III.A.

Even if the Court did not construe this claim as one for failure to investigate, the claim would fail because Plaintiff has not adequately pleaded that her constitutional rights were violated. For while "[i]t is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence," *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994), in the absence of a constitutional violation, there can be no violation of the duty to intervene, *see Curley*, 268 F.3d at 72 (finding that "where . . . the arresting officers committed no infringement," there could be no liability based on the violation of the duty to intervene).

19

Because Plaintiff has not sufficiently alleged that her constitutional rights were violated, her claim for violation of the duty to intervene must also be dismissed.

### F. *Monell* Liability

Plaintiff's failure to adequately plead that her constitutional rights were violated also precludes her from stating a claim for municipal liability against the City. For when "a person has suffered no constitutional injury at the hands of the individual police officer, the fact that the departmental regulations might have *authorized* the [constitutional violation] is quite beside the point." *City of Los Angeles v. Heller*, 475 U.S. 796, 799 (1986) (emphasis in original); *see, e.g., Mitchell v. City of New York*, No. 12-cv-2674 (LAK), 2014 WL 535046, at *6 (S.D.N.Y. Feb. 11, 2014) ("Having held that plaintiffs have failed to adduce facts supporting a constitutional claim, plaintiffs' claim of municipal liability must fail under the rule announced in *Monell*."). Accordingly, Plaintiff's claims against the City are dismissed as well.

But even if Plaintiff had adequately pleaded that her constitutional rights were violated, her claim for municipal liability would fail. While no heightened pleading standard applies to claims for municipal liability under § 1983, a plaintiff alleging municipal liability must nevertheless plead facts sufficient to render plausible the claim that her injuries were caused by a municipal custom or policy. *See Plair v. City of New York*, 789 F. Supp. 2d 459, 468-69 (S.D.N.Y. 2011). The threadbare allegations in the Complaint fail to meet this standard. For example, Plaintiff's conclusory assertion that it was the "custom[], practice[], procedure[] and rule[]" of the City to engage in the "abuse of authority to deprive citizens of their right to lodge complaints about a city agency, namely the NYPD," Compl. 55, is not accompanied by any facts giving rise to a plausible inference that such a policy or practice actually existed. There is, for instance, "no allegation that any official policymaker or policymaking body took any action to

20

establish" such a policy, nor any other factual allegation tending to show that such a policy was in place. *Missel v. Cnty. of Monroe*, 351 F. App'x 543, 545-46 (2d Cir. 2009) (citing *Dwares v. City of New York*, 985 F.2d 94, 100-02 (2d Cir. 1993)). This failure to adequately plead that her injuries were caused by a municipal custom or policy provides an additional reason to dismiss Plaintiff's *Monell* claim against the City. *See id.*

### G.  State Law Claims

The Court having determined that Plaintiff has failed a claim to relief under federal law, only her state-law claims remain. Whether to exercise supplemental jurisdiction over these claims is a decision resting "within the sound discretion of the district court." *Lundy v. Catholic Health Sys. of Long Island Inc.*, 711 F.3d 106, 117 (2d Cir. 2013) (citing *Carnegie-Mellon Univ. v. Cohill*, 484 U.S. 343, 349-50 (1988)). Ordinarily, when "all federal-law claims are eliminated before trial, the balance of factors to be considered under the pendent jurisdiction doctrine—judicial economy, fairness, and comity—will point toward declining to exercise jurisdiction over the remaining state-law claims." *Carnegie-Mellon Univ.*, 484 U.S. at 350 n.7; *see, e.g., Healy v. City of New York Dep't of Sanitation*, 286 F. App'x 744, 746-47 (2d Cir. 2008) (concluding that where plaintiff's federal claims were "dismissed at an early stage of the litigation," district court should have "declin[ed] to exercise supplemental jurisdiction"). The Court concludes those factors do indeed weigh against the exercise of supplemental jurisdiction in this case, and Plaintiff's state-law claims are accordingly dismissed without prejudice so that she may pursue them in state court if she wishes.

## IV.     Conclusion

For the foregoing reasons, Defendant's motion to dismiss is granted, and Plaintiff's Complaint is dismissed for failure to state a claim, except that her state-law claims are dismissed without prejudice.  The Clerk of Court is requested to terminate the case.

SO ORDERED.

This resolves Dkt. No. 24.

Dated: September ___, 2014
       New York, New York

_____
ALISON J. NATHAN
United States District Judge

22